**Willie L. HICKS, Jr., Appellant,**

v.

**UNITED STATES, Appellee.**

No. 96–CF–956.

District of Columbia Court of Appeals.

Argued Jan. 26, 1999.

Decided June 3, 1999.

Severina B. Rivera, Washington, DC, for appellant.

L. Jackson Thomas II, Assistant United States Attorney, with whom Wilma A. Lewis, United States Attorney, and John R. Fisher, Thomas J. Tourish, Jr., and Roger L. Kemp, Assistant United States Attorneys, were on the brief, for appellee.

Before FARRELL and RUIZ, Associate Judges, and PRYOR, Senior Judge.

FARRELL, Associate Judge:

Found guilty by a jury of two counts of armed robbery and related weapons offenses, appellant contends that a show-up identification of him by one of the victims and physical evidence (chiefly a sawed-off shotgun) seized from the car in which he was riding should have been suppressed as the fruits of a Fourth Amendment violation. Although we conclude that the search of the car was unlawful because done without probable cause, we agree with the trial judge that the shotgun and the identification of appellant were both admissible under the doctrine of inevitable discovery. We therefore affirm.

## I.

The following facts were adduced at the suppression hearing. At about 12:40 a.m. on July 1, 1995, the complaining witness ("O'Malley") was walking home when he was grabbed from behind by a man who emerged from a car that had just passed O'Malley. Two other men stayed in the car. The assailant, who carried an object resembling a pipe with a cord around it, demanded O'Malley's money. O'Malley emptied the contents of his pockets on the ground, after which the assailant inspected the discarded items, took some and put them in his pocket, and told O'Malley to run away. O'Malley ran to his nearby apartment and called the police.

Metropolitan Police Officer Loepere responded to the scene. After interviewing O'Malley, he broadcast a lookout for the car carrying the assailant and the two other men. The car was an older model, light blue or gray, American-made station wagon with its missing rear window covered by plastic. At about 2:15 a.m. that day, Metropolitan Police Sergeant Morgan recognized a station wagon matching that description occupied by three males and driving in a location five blocks from the robbery. He summoned other police units, and together they stopped the station wagon and approached it with guns drawn. The three occupants were removed from the car, frisked, and placed on the ground. At some point they were handcuffed.[1] The police then searched the car and found a sawed-off shotgun concealed behind a child's car seat. They radioed to Officer Loepere that a car had been stopped matching the broadcast description, telling him to bring the robbery victim to the scene. They soon learned that Loepere "was getting the complainant and bringing him down there." The occupants, including appellant, were placed in a police van to await O'Malley's arrival. According to Sergeant Morgan, however, they "were going to be arrested regardless of any identification" because of their possession of the shotgun.

On hearing that the station wagon had been stopped, Officer Loepere had a police dispatcher contact O'Malley at his home, and Loepere then drove the victim to where the occupants were being held. Appellant and the others were removed from the police van one by one, and at about 2:30 a.m., O'Malley identified appellant positively as the man who had emerged from the station wagon and robbed him. A renewed search of the station wagon yielded a credit or debit card belonging to

---

1. At just what point this took place is uncertain from the record. In denying the motion to suppress, the trial judge assumed the handcuffing took place before the shotgun was discovered, and we do also.

O'Malley.[2]

In denying appellant's motion to suppress the identification and physical evidence, the trial judge first found that the police had a reasonable basis for stopping the station wagon under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and detaining the occupants for a showup identification.[3] At the same time, she rejected the government's position that the shotgun was in plain view from the officers' vantage point outside the vehicle; and thus, she ruled, the search of the car exceeded the bounds of a lawful *Terry* stop. She nonetheless held the shotgun and ensuing identification of appellant admissible on the basis of inevitable discovery. She rejected as "outside the realm of any reasonableness" appellant's contention that "it was somehow the discovery of the shotgun which caused the showup to occur." Rather, she had "no doubt that with the three people in the car and the report of the robbery, ... the showup identification came about as a result of the earlier robbery report and completely independently of the discovery of the shotgun."

## II.

The government concedes that the search of the station wagon was without probable cause and thus unlawful.[4] It relies instead on the inevitable discovery doctrine. Appellant argues, in turn, that the predicate for applying that doctrine is missing, because there was no police investigation untainted by illegality that "inevitably" would have led to his identification and an ensuing search of the car incident to arrest. He contends that his stop and detention by the police was unlawful from the very outset because of the degree of

force the police employed, converting what might have been a valid *Terry* stop into an arrest without probable cause; and that without this unlawful arrest there was missing the required "actuality" that an independent police investigation would ultimately have brought O'Malley together with appellant for an identification.

■ The inevitable discovery doctrine provides that, even though the police have obtained evidence as a result of illegal conduct, the evidence still may be admitted "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." *Nix v. Williams*, 467 U.S. 431, 444, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). If "the evidence in question would inevitably have been discovered without reference to the police error or misconduct, there is no nexus sufficient to provide a taint and the evidence is admissible." *Id.* at 448, 104 S.Ct. 2501. Importantly, however, the doctrine "involves no speculative elements but focuses [instead] on demonstrated historical facts capable of ready verification or impeachment." *Id.* at 444–45 n. 5, 104 S.Ct. 2501. That is, "the lawful process which would have ended in the inevitable discovery [must] have ... commenced before the constitutionally invalid seizure," *Douglas–Bey v. United States*, 490 A.2d 1137, 1139 n. 6 (D.C.1985), *and* there must be "the requisite actuality" that the discovery would have ultimately been made by lawful means. *Hilliard v. United States*, 638 A.2d 698, 707 (D.C.1994) (internal quotation marks omitted); *see also District of Columbia v. M.M.*, 407 A.2d 698, 702 (D.C. 1979).

**2.** Trial testimony revealed that the two victims of a second robbery, committed by the same three men shortly after the O'Malley robbery, were later brought to the scene as well, where one identified another of the three men as the man who had robbed them.

**3.** The government did not contend, and does not argue on appeal, that the description of

the station wagon and its occupants gave the police probable cause to arrest the occupants. Although the description of the car was certainly distinctive, we do not question the government's concession on this point, and take the case as it comes to us.

**4.** That is, it does not take issue with the trial judge's rejection of the plain view argument.

If appellant were correct that he was arrested immediately upon being stopped by the police, the necessary "actuality" that the police would ultimately have secured the identification by lawful means would indeed be missing. Before that arrest, the investigation would have consisted only of Officer Loepere's interview with the complaining witness and broadcast of a description of the car carrying the robber and his companions. The likelihood that a valid *Terry* stop and detention (rather than the unlawful arrest appellant says took place) would have brought appellant face-to-face with the victim for identification would be speculative. We therefore must consider appellant's argument that the police arrested him from the outset without probable cause. We reject the argument.

## A.

"The last decade," a court observed in 1994,

> has witnessed a multifaceted expansion of *Terry* [*v. Ohio*], including the trend granting officers greater latitude in using force in order to "neutralize" potentially dangerous suspects during an investigatory detention. For better or for worse, the trend has led to the permitting of the use of handcuffs, the placing of suspects in police cruisers, the drawing of weapons and other measures of force more traditionally associated with arrest than with investigatory detention.

*United States v. Tilmon,* 19 F.3d 1221, 1224–25 (7th Cir.1994) (citation omitted; internal quotation marks partly omitted). In good part this trend stems from the Supreme Court's recognition that *Terry* stops "involve[ ] a police investigation 'at close range'" in which an officer "must make a 'quick decision as to how to protect himself and others from possible danger,'" with the result that courts are reluctant to second-guess police failure to "adopt alternative"—and less restrictive—"means to ensure their safety" in that context. *Michigan v. Long,* 463 U.S. 1032, 1052, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983) (quoting *Terry,* 392 U.S. at 24, 28, 88 S.Ct. 1868).

"[T]he scope of permissible police action in any investigative stop depends on whether the police conduct was reasonable under the circumstances." *In re M.E.B.,* 638 A.2d 1123, 1127 (D.C.1993). Applying that standard, our own decisions have recognized that "handcuffing the detainee, like length of detention, place of detention, and other considerations, is simply one factor, among many, that the trial judge must consider in weighing whether a detention for investigation crossed the line into the realm of arrest." *Id.* at 1128; *see also Womack v. United States,* 673 A.2d 603, 608–11 (D.C.1996). We next consider the relevant features of appellant's stop to decide whether they crossed the line into an arrest.

■ The police, consisting of officers from "about three [scout] cars," blocked the station wagon and approached it with guns drawn. They removed the three occupants, frisked them, placed them on the ground, and handcuffed them. *See* note 1, *supra.* The detention took place at 2:15 in the morning and stemmed from a report of a robbery involving "three subjects." Its purpose, until the shotgun was found, was investigative: to allow an on-scene identification (or not) by the complaining witness. And the force employed was intended to secure the safety of the officers, and the presence of the suspects, until that identification could take place. The total time of detention, even crediting appellant's testimony, was not more than twenty-five minutes. The police testimony, which the trial judge in fact appeared to credit, gave the time between the stop and the identification as some fifteen minutes.

Neither individually nor in the aggregate do these facts exceed the limits of a lawful *Terry* detention. *See Womack,* 673 A.2d at 608–11; *In re M.E.B.,* 638 A.2d at 1126–28; *Davis v. United States,* 498 A.2d 242, 245 (D.C.1985); *Franklin v. United*

*States,* 382 A.2d 20, 22–23 (D.C.1978). *See, e.g., United States v. Hensley,* 469 U.S. 221, 235, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985); *United States v. Ocampo,* 890 F.2d 1363, 1368–70 (7th Cir.1989). Indeed, appellant can identify only one feature in which this case arguably deviates from the pattern of the above-cited cases: the radio report apparently termed the crime a "robbery" rather than an "armed robbery," [5] and gave no other indication that the occupants were armed. We regard this difference as insignificant. Robbery is a violent crime, *see* D.C.Code § 22–3201(f) (1996) ("robbery" an enumerated "crime of violence" for purpose of sentence enhancement statute), one that police "mak[ing] a quick decision as to how to protect [themselves] and others from possible danger," *Terry,* 392 U.S. at 28, 88 S.Ct. 1868, may reasonably assume entailed the use of a weapon. *See, e.g., Tilmon,* 19 F.3d at 1227 (police may draw weapons if the "suspect is thought to be armed, or even when he is thought to be involved in criminal activity in which the use of weapons is commonplace") (quoting *United States v. Aurelio Lechuga,* 925 F.2d 1035, 1040 (7th Cir. 1991)). In the setting in which the police found themselves, confronting three suspected robbers at night, requiring them to have calibrated their response based upon a distinction between robbery and armed robbery would be an unreasonable application of the Fourth Amendment.

In sum, until the police searched the station wagon and found the shotgun, appellant was lawfully restrained under a detention supported by reasonable suspicion and "designed to last only until a preliminary investigation either generate[d] probable cause or result[ed] in [his] release." *Womack,* 673 A.2d at 608 (citing *In re M.E.B.,* 638 A.2d at 1126).

**5.** We say "apparently" because neither side questioned Sergeant Morgan on that precise point.

**6.** The government acknowledges in its brief that "if, as appellant contends, he was illegally *under arrest* (but lawfully stopped) when

**B.**

■ Once the police searched the car and discovered the shotgun, however, the equation changed: appellant, as Sergeant Morgan explained, was not going to be released regardless of the outcome of the showup identification. At that point, he not only was not free to leave (any more than he was before the search), but he was going to be transported to the police station and booked for possessing the shotgun as soon as the identification procedure was over. In short, he was under arrest. *See Womack,* 673 A.2d at 608 ("Generally, an arrest is effected when the police have made a determination to charge the suspect with a criminal offense and custody is maintained to permit the arrestee to be formally charged and brought before the court."). Moreover, since that arrest was the direct fruit of the unlawful search of the car, and in turn set the stage for the confrontation of appellant with the victim O'Malley, admissibility of the identification depends on application of the inevitable discovery doctrine.[6]

The purpose of the doctrine, as the Supreme Court said in *Nix, supra,* is to ensure that, while the government does not profit from its illegality, "the prosecution is not put in a *worse* position simply because of some earlier police error or misconduct." 467 U.S. at 443, 104 S.Ct. 2501 (emphasis in original). Hence, the fact " 'that the challenged evidence is *in some sense* the product of illegal governmental activity' .... does not end the inquiry," so long as the prosecution can show by the requisite standard of proof that "the evidence ... would inevitably have been discovered without reference to the police error or misconduct." *Id.* at 444, 448, 104 S.Ct. 2501 (quoting *United*

Mr. O'Malley made his identification" (emphasis in original), inevitable discovery rather than the kindred doctrine of "independent source," *see Nix,* 467 U.S. at 443, 104 S.Ct. 2501, must provide the analytic framework.

*States v. Crews,* 445 U.S. 463, 471, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980) (emphasis in *Nix* )).

We have little difficulty sustaining the trial judge's conclusion that the test was met here. Had the police not searched the station wagon before notifying Officer Loepere of the stop of the car, there is not the slightest reason to believe that events would have unfolded any differently. Appellant asserts that finding the shotgun may have influenced the police on the scene to notify Loepere, but, as the trial judge remarked, that is "outside the realm of any reasonableness." Sergeant Morgan did not mention the shotgun in advising Loepere of the stop and instructing him to bring O'Malley to the scene; nor had Loepere mentioned a weapon in broadcasting the lookout for the station wagon and the robber. Even after the shotgun was found and appellant was placed in the police van, the police kept him at the scene to permit the identification. Since that was the very purpose of the stop, the suggestion that *detaining him depended on their finding additional evidence in the car is itself sheer speculation.* In these circumstances, to exclude either the identification or *its* fruit, the shotgun, *see New York v. Belton,* 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981) (search of passenger compartment of car permitted incident to lawful arrest), would put the prosecution in a *worse* position than if the police had not searched the car. That *Nix* does not allow.

*Affirmed.*

RUIZ, Associate Judge, concurring:

I agree with the majority opinion that the show-up identification by the complaining witness and the shotgun that was recovered from the car Hicks was driving were both admissible under the doctrine of inevitable discovery. I do not, however, join the majority's analysis and conclusion that the police's alleged actions in stopping Hicks' car, with several officers from three patrol cars approaching with guns drawn, ordering the occupants out of the car, and then frisking, handcuffing, securing and keeping them in a police van for fifteen to twenty-five minutes for a show-up identification, when viewed in totality, were all part of a proper *Terry* stop and did not impermissibly cross over into an arrest. In the circumstances of this case, it is unnecessary to address this issue because the specific incidents on which the majority correctly bases its application of the inevitable discovery theory do not depend on whether the police's handling of Hicks and the other occupants after the car was stopped continued to be within the scope of a proper *Terry* stop or became an unlawful arrest.[1]

The factors relied upon for inevitable discovery are: 1) the complaining witness' detailed description to Officer Loepere of the older model American-made station wagon with plastic covering the missing rear window in which the assailant drove away after the robbery, 2) the radio report of that description to officers in the field, 3) the police stop of Hicks and the other occupants when they saw a car fitting that distinctive description ninety minutes later a few blocks from where the robbery took place and, finally, 4) the radio call to Officer Loepere who, in turn, called the complaining witness at home and accompanied him to the scene where Hicks was being detained. These factors—none of which is challenged by Hicks as improper police conduct[2]—either preceded the police actions that Hicks challenges as impermissible in a *Terry* stop, or, in the case of the call to Officer Loepere to bring the complaining witness for a show-up, had been set in train as a result of those preceding actions. Although the inevitable discovery

1. There is no doubt, as the majority states, that the police's search of the vehicle and seizure of the shotgun hidden beneath a child's car seat was without probable cause.

2. Hicks does not contend that the police did not have reasonable articulable suspicion to stop the car, and it is clear that they did.

doctrine allows no "speculative elements," *see Nix v. Williams,* 467 U.S. 431, 445 n. 5, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984), there is nothing speculative in the belief that, once the distinctive car was seen and stopped, the radio call would have issued to Officer Loepere and that he would bring the complaining witness to identify the suspects. As the trial court stated, and the majority notes, what would be speculative is to believe otherwise as it would be "outside the realm of reasonableness." Where the police have information sufficient to stop a suspect and subject him to a show-up identification, as here, and there is nothing in the record to suggest that the identification would not have occurred but for some supervening illegality, the inevitable discovery doctrine permits us to conclude that the identification would have resulted from the lawful conduct. *See id.* at 444, 104 S.Ct. 2501. Once the identification was made, the police had probable cause to arrest Hicks and to conduct a lawful search of the car which would have revealed the shotgun. *See New York v. Belton,* 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981). Thus, both the identification and the shotgun were admissible.

In sum, I see no need to decide whether the police crossed the line after their initial stop of the car in order to conclude that, regardless, the evidence sought to be suppressed was admissible because it inevitably would have been discovered as a result of proper police procedures. I do not suggest, of course, that it will always be possible, in the fast-moving pace of police activity, to parse police conduct so that clearly permissible actions are separable from other, questionable conduct and to conclude that the former, standing alone, support eventual inevitable discovery of evidence. But in this case, the record supports that we can rely on police conduct that is untainted by possible illegality.