UNITED STATES, Appellant,

v.

Lorenzo Ali DEBRUHL, Appellee.

No. 09–CO–1208.

District of Columbia Court of Appeals.

Argued Jan. 20, 2012.

Decided Feb. 23, 2012.

Elizabeth Trosman, Assistant United States Attorney, with whom Ronald C. Machen Jr., United States Attorney, and Roy W. McLeese III, Assistant United States Attorney, were on the brief, for appellant.

Thomas W. Farquhar for appellee.

Mikel–Meredith Weidman, Public Defender Service, with whom James Klein, Samia Fam, and Chris Kemmitt, Public Defender Service, were on the brief for Amicus Curiae Public Defender Service.

Before THOMPSON, Associate Judge, and FERREN and REID, Senior Judges.

On Petition for Rehearing

FERREN, Senior Judge:

After our initial hearing of this case, the court ruled in favor of the defendant-appellee, Lorenzo Ali Debruhl.[1] We affirmed the trial court's pre-trial ruling that the federal "exclusionary rule," rather than the "good faith exception" to that

1. *United States v. Debruhl,* 993 A.2d 571 (D.C.   2010) (*Debruhl I*).

rule, should be applied retroactively to enforce the Supreme Court's decision in *Arizona v. Gant.*[2] Thus, we affirmed suppression at trial of the drugs and related contraband found by the police in a warrantless search of Debruhl's car. After our decision, the Supreme Court addressed the good-faith exception in *Davis v. United States,*[3] and sustained its application in the very post-*Gant* context presented in *Debruhl.* We therefore granted rehearing to determine whether, in light of *Davis,* our decision in *Debruhl* can be reaffirmed. We now reverse and remand.

## I.

On January 11, 2009, Metropolitan Police Department officers saw an Oldsmobile traveling with its lights off between 1:00 and 2:00 a.m. in the 900 block of Hamilton Street, N.E. They conducted a traffic stop, ran a license plate check, and discovered no listing for the tags. Upon checking the driver's license and registration, the officers found that the registration matched the license plate but not the car. A check of the vehicle identification number revealed that the car was unregistered. One of the officers asked the sole occupant, the driver, Debruhl, to step out of the car, placed him under arrest, secured him with handcuffs, and placed him behind the car. The other officer searched the passenger compartment and found a

brown paper bag under the driver's seat containing a pair of gloves, a digital scale, razor blades, some currency, and a clear plastic bag with a white rock substance inside that field-tested positive for cocaine. A grand jury indicted Debruhl on one count each for possession of a controlled substance with intent to distribute and for possession of drug paraphernalia. Before trial, Debruhl filed a motion to suppress the drugs and drug paraphernalia, which the trial court granted in September 2009.

Meanwhile, three months or so after Debruhl's arrest and the related search of his car, the Supreme Court in *Gant* clarified the reach of *New York v. Belton.*[4] It declared unconstitutional the warrantless seizure of evidence from the passenger compartment of a vehicle from which the occupants—like Debruhl—had been removed, handcuffed, and sequestered.[5] No one disputes that, by virtue of *Griffith v. Kentucky,*[6] *Gant's* interpretation of the Fourth Amendment would apply not only to Gant's trial and future cases but also to all cases, such as Debruhl's, that were "not yet final"[7] when *Gant* was decided. In *Debruhl I,* however, we acknowledged that the exclusionary rule will not always accompany a retroactive application of the Fourth Amendment.[8] Rather, the good-faith exception will apply, we said, when police officers who unlawfully seize evidence from a car, without a warrant, have

2. 556 U.S. 332, 129 S.Ct. 1710, 173 L.Ed.2d 485 (2009).

3. —— U.S. ——, 131 S.Ct. 2419, 180 L.Ed.2d 285 (2011).

4. 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981).

5. *Gant,* 556 U.S. at 355, 129 S.Ct. 1710 ("[W]e hold that *Belton* does not authorize a vehicle search incident to a recent occupant's arrest after the arrestee has been secured and cannot access the interior of the vehicle.").

*Gant* also added a ground for a warrantless automobile compartment search not found in *Belton:* "when it is reasonable to believe that evidence of the offense of arrest might be found in the vehicle." *Id.*

6. 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987).

7. *Id.* at 328, 107 S.Ct. 708.

8. *See Debruhl I,* 993 A.2d at 574–75 (explaining that exclusionary rule is not tied to retroactivity of Fourth Amendment).

relied on settled appellate precedent that permitted their search under *Belton* before the Supreme Court added *Gant's* clarification to the contrary.[9] Our decision therefore turned on whether, at the time of arrest and seizure, there was settled precedent in this jurisdiction, under *Belton,* that justified the warrantless search of Debruhl's car. We held that there was not, because no case in this jurisdiction was "settled as to all the material facts" the officers faced.[10]

A material fact, in the context here, is any fact necessary to justify-or forbid-the warrantless search of an automobile compartment under *Belton.* After the Supreme Court in *Gant* added sequestration of the occupants as a material consideration for the scope of a search, the officers in *Debruhl*—for the good-faith exception to apply—must have relied on pre-*Gant* precedent holding that this now material fact was immaterial at the time of their search. If the officers searched without a warrant in the absence of such settled precedent, then Debruhl's case itself, we noted, would contain a factual variant-sequestration of the occupants—that had not yet been addressed by this court, and thus was not part of our "settled" jurisprudence justify-

ing warrantless car searches.[11] With this understanding, we elaborated our decision as follows.

In *Belton,* the Supreme Court announced a " 'bright-line' rule"[12] permitting the warrantless search of an automobile passenger compartment. The Court held that "when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile."[13] This was intended as a practical rule, justified only because of its close approximation to the scope of a warrantless search of an individual permitted by *Chimel v. California.*[14] The rationale justifying a *Chimel* search, and thus a search under *Belton,* was the dual need to protect the arresting officer against a "weapon" the suspect might have within his "immediate control," as well as to preserve "destructible evidence" the suspect might otherwise dispose of.[15] Eventually, however, *Belton's* bright-line rule became problematic.[16] As we demonstrated in *Debruhl I,*

> bright-line rules do not easily remain radiant. Although *Belton* was ... intended for simple, clear cut application,

9. *Id.* at 575–76, 578–79.

10. *Id.* at 584–85 (" 'settled law' in the jurisdiction [means] settled as to the material facts at issue") (emphasis omitted) [hereafter the "settled material facts" rule].

11. *See United States v. Harris,* 617 A.2d 189, 192 (D.C.1992) ("In short, we are bound by directly applicable authority, that cannot be distinguished from the facts of this case, which holds that search of the vehicle under the circumstances of this case is proper.").

12. *Belton,* 453 U.S. at 463, 101 S.Ct. 2860 (Brennan, J., dissenting).

13. *Id.* at 460, 101 S.Ct. 2860 (footnotes omitted). The Court added: "It follows from this

conclusion that the police may also examine the contents of any containers found within the passenger compartment ... whether [the container] is open or closed." *Id.* at 460–461, 101 S.Ct. 2860.

14. 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). *See also Debruhl I,* 993 A.2d at 580–81 (discussing *Belton's* bright-line rule as response to difficulties arising from application of *Chimel* in vehicle context).

15. *Belton,* 453 U.S. at 458, 460, 101 S.Ct. 2860 (quoting *Chimel,* 395 U.S. at 763, 89 S.Ct. 2034).

16. *Debruhl I,* 993 A.2d at 582–83 (discussing *Thornton v. United States,* 541 U.S. 615, 124 S.Ct. 2127, 158 L.Ed.2d 905 (2004) and movement towards *Gant* ).

it is evident from *Belton's* history that such rules are often likely to remain truly "bright line" only for a limited period of time as factual scenarios test their limits. *Belton* has become a classic case of a rule beclouded over time by exceptions generated by unique facts that pushed decisions beyond the "bright line" license-as evidenced by . . . three federal circuits that anticipated *Gant.*[17]

The three federal precursors of *Gant,* and then *Gant* itself, focused upon the reality that once all occupants had been removed from a vehicle, handcuffed, and sequestered, *Chimel's* dual rationale-protection of officer and preservation of evidence—had been satisfied; the reasons for a warrantless, protective search had been eliminated. Thus came *Gant's* clarification limiting *Belton* searches to those in which one or more occupants were still in the vehicle or, if removed, were not yet sequestered in a manner that assuredly would protect officers and preserve evidence.[18] Hence the question in *Debruhl:* was there an appellate decision in this jurisdiction,[19] authorizing a *Belton* search after all occupants of the car had been handcuffed and sequestered, that would justify our application of the good-faith

exception to permit introduction at trial of the contraband seized from Debruhl's car despite the officers' Fourth Amendment violation in seizing it?

The two decisions of this court approximating the facts in *Debruhl,* and on which we principally relied for analysis at the government's urging, are *Staten v. United States*[20] and *United States v. Harris.*[21] Unlike *Debruhl I,* however, both dealt with protective searches of automobiles either before all occupants had been removed (*Harris* ) or before all occupants had been sequestered (*Staten* ). We summarily distinguished three other *Belton* cases cited by the government,[22] none of which involved protective searches, on the grounds that one focused on the "contemporaneous incident" element of *Belton,*[23] another turned on the "inevitable discovery" doctrine,[24] and the third held the motion to suppress untimely filed and thus addressed *Belton* only in dictum.[25] Accordingly, because neither *Staten* nor *Harris* included a fact—sequestration before a *Belton* search—that was material, indeed determinative, in *Gant,* we found no relevant, "settled" precedent on which the police officers in *Debruhl* could have relied to support the good-faith exception. We

17. *Debruhl I,* 993 A.2d at 583–84 (citing *United States v. Green,* 324 F.3d 375, 379 (5th Cir.2003) (search unauthorized by *Belton* where arrestee lay handcuffed on ground several feet from vehicle); *United States v. Edwards,* 632 F.3d 633, 643–44 (10th Cir.2001) (search not authorized by *Belton* where arrestee was handcuffed and seated in police vehicle); *United States v. Vasey,* 834 F.2d 782, 787 (9th Cir.1987) (search not authorized by *Belton* where arrestee was handcuffed and secured in police car for more than half hour before search)).

18. *See supra* note 5.

19. No decision from the U.S. Court of Appeals for the District of Columbia Circuit af-

fects the analysis. *See Debruhl I,* 993 A.2d at 586 & n. 89.

20. 562 A.2d 90 (D.C.1989).

21. *Supra* note 11.

22. *Debruhl I,* 993 A.2d at 581 n. 55.

23. *Smith v. United States,* 435 A.2d 1066 (D.C. 1981) (per curiam).

24. *Hicks v. United States,* 730 A.2d 657 (D.C. 1999).

25. *Olafisoye v. United States,* 857 A.2d 1078 (D.C.2004).

held, therefore, that the exclusionary rule applied in *Debruhl I*.

## II.

Then came *Davis*.[26] Like *Gant* and *Debruhl, Davis* concerned situations in which the police—before the *Gant* decision came down—removed, handcuffed, and sequestered the occupants of a car and "then searched the passenger compartment," finding the contraband at issue.[27] According to *Davis*, the police

> followed the Eleventh Circuit's *Gonzalez*[28] precedent to the letter. Although the search turned out to be unconstitutional under *Gant*, all agree that the officers' conduct was in strict compliance with then-binding Circuit law and was not culpable in any way.[29]

Then, in affirming the circuit court's ruling based on the good-faith exception, the Supreme Court held that "when the police conduct a search in objectively reasonable reliance on binding appellate precedent, the exclusionary rule does not apply."[30]

By premising the good-faith exception on "strict compliance" with "binding appellate precedent," and by noting that the search was justified by police reliance "to the letter" on precedent that would later be held unconstitutional under *Gant*, the Court was saying, we believe, that the precedent (*Gonzalez*) on which the police relied for the good-faith exception in *Davis*, embraced all the facts material to the decision in *Davis*, including handcuffed and sequestered occupants.[31] Otherwise, as we emphasized in *Debruhl I*, there would have been no "explicit protection or 'cover' " from the appellate court on which the officer could rely to block application of the exclusionary rule.[32] There would, in other words, have been a gap in precedent leaving no reasonable, objective basis for a police officer to conclude that the appellate court would have been bound to uphold the search on *Gant*-type facts before *Gant* was decided.

The particular "binding appellate precedent" on which the Eleventh Circuit relied in *Davis*, namely its earlier decision in *Gonzalez*, was precedent in which the relevant settled material facts—handcuffed and sequestered occupants—were virtually identical to, and thus legally congruent with, the facts before the later, *Davis* court that was bound by that precedent. There remains, nonetheless, the question whether "binding appellate precedent," as contemplated by *Davis*, could have a more comprehensive meaning than the "settled material facts" rule we applied in *Debruhl I*.[33] We turn to that inquiry, beginning

---

26. *Supra* note 3.

27. *Davis*, 131 S.Ct. at 2425–26.

28. *United States v. Gonzalez*, 71 F.3d 819, 822 (11th Cir.1996) (upholding automobile search conducted after defendant had been "pulled from the vehicle, handcuffed, laid on the ground, and placed under arrest").

29. *Davis*, 131 S.Ct. at 2428.

30. *Id.* at 2434.

31. In *Davis*, the Eleventh Circuit noted that a police officer "arrested Davis for giving a false name and placed him, handcuffed, in the back of his patrol car. The driver of the vehicle was also arrested, handcuffed, and placed in a separate patrol car. Once the vehicle's occupants had been secured, Miller searched it and found a revolver in one of Davis's jacket pockets." *United States v. Davis*, 598 F.3d 1259, 1261 (11th Cir.2010). This was the factual equivalent of the situation in *Gonzalez* (quoted *supra* note 28).

32. *Debruhl I*, 993 A.2d at 585.

33. *See Briscoe v. State*, 422 Md. 384, 30 A.3d 870, 883 (2011) ("We understand the *Davis* Court's reference to binding appellate precedent to mean that the caselaw of the jurisdiction must have been clear about whether that

from the premise that for purposes of this case we are to focus on the appellate jurisprudence of this court.[34]

## III.

For "binding" or "settled" precedent in this jurisdiction we look first to our decision in *M.A.P. v. Ryan*.[35] There, we adopted the rule that "no division of this court will overrule a prior decision of this court"; only the en banc court may do so.[36] Accordingly, we can reaffirm *Debruhl I* if—but only if—we correctly concluded that none of our prior *Belton* decisions bound us, as a division, to hold that the police objectively relied on precedent that justified the search of Debruhl's passenger compartment. We therefore turn more specifically to what it means for a "prior decision of this court" to be "binding" under *M.A.P. v. Ryan*—and thus "binding appellate precedent" under *Davis*.

■ This court has equated binding precedent under *M.A.P.* with the rule of *stare decisis*.[37] We have stressed, however, that "*stare decisis* is never properly invoked unless in the decision put forward as precedent the judicial mind has been applied to and passed upon the precise question."[38] Indeed, " '[q]uestions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents.' "[39]

In *Debruhl I*, when applying the "settled material facts" rule to define binding precedent, we concluded that neither of this court's factually relevant *Belton* decisions, *Staten* and *Harris*, satisfied the rule. Neither decision (in the words of our *stare decisis* precedent) had "passed upon the precise question"[40] presented in *Debruhl I*, namely, whether *Belton* permitted a warrantless search of the passenger compartment *after* complete sequestration of the occupants. We therefore deemed that factual difference material, indeed dispositive, because it reflected *Gant's* recognition that the very justification for a *Belton* protective search—*Chimel's* concern about officer safety and preservation of evidence—had disappeared upon sequestration.[41]

jurisdiction had adopted the bright-line rule of *Belton*.").

**34.** *See supra* note 19.

**35.** 285 A.2d 310 (D.C.1971); *see Debruhl I,* 993 A.2d at 586 n. 90.

**36.** *M.A.P.,* 285 A.2d at 312 (footnote omitted).

**37.** *See Penn Mut. Life Ins. Co. v. Abramson,* 530 A.2d 1202, 1207 (D.C.1987).

**38.** *Murphy v. McCloud,* 650 A.2d 202, 205 (D.C.1994) (citation omitted) (stating, in probate case, that prior decision resolving similar issue on merits did not resolve whether present case concerned final appealable order, an issue not raised in prior case); *accord District of Columbia v. Sierra Club,* 670 A.2d 354, 360 (D.C.1996) (stating that prior case did not control question whether this court had jurisdiction to review Mayor's decision to discontinue curbside recycling program because no party had raised jurisdictional issue in prior case).

**39.** *Murphy,* 650 A.2d at 205 (quoting *Webster v. Fall,* 266 U.S. 507, 511, 45 S.Ct. 148, 69 L.Ed. 411 (1925)); *accord Sierra Club,* 670 A.2d at 360.

**40.** *Murphy,* 650 A.2d at 205.

**41.** Our ruling in *Debruhl I* was analogous to our decision in *Lewis v. United States,* 632 A.2d 383 (D.C.1993), where we held that a new material fact, a driver's distance from the car after parking and locking it, was sufficient to distinguish *Belton's* bright-line rule permitting the warrantless search of an "occupant" of an automobile. *But see Thornton v. United States,* 541 U.S. 615, 124 S.Ct. 2127, 158 L.Ed.2d 905 (2004) (upholding *Belton* search after driver had gotten out of car in parking lot).

Is it possible, however, for *Belton* precedent—specifically, *Staten* and *Harris*—to provide "binding" support for the officer's search in *Debruhl* even though not all the occupants of the car in either case were handcuffed and sequestered at the time of the search? We held in *Debruhl I* that the answer is "no"—that the settled material facts rule is the universe for binding precedent-because of our concern that factual variants from the precedent on which a police officer relies could lead this jurisdiction toward acceptance of the discredited "mistake of law" justification for Fourth Amendment violations.[42] That said, however, even a settled material facts rule requires a process for determining what facts in a particular context are "material" or "immaterial" for purposes of comparing a pending matter with a prior decision; and that question about process requires a further inquiry than we pursued in *Debruhl I*—an inquiry that expands our understanding of "settled" or "binding" appellate precedent.

## IV.

We turn first to the facts material in *Belton*. We have said that *Belton* announced a "two-pronged test" and created factual boundaries with this "bright-line" rule.[43] This bright-line rule emerged be-

---

42. *See Debruhl I*, 993 A.2d at 577–78, 587–88 (citation omitted) (discussing mistake of law versus good faith exception and danger in allowing police interpretation of judicial decisions to qualify for good faith exception); *In re T.L.*, 996 A.2d 805, 816 & n. 38, 817 & n. 39 (D.C.2010) (quoting *United States v. Chanthasouxat*, 342 F.3d 1271, 1279–80 (11th Cir. 2003) ("Unlike an objectively reasonable mistake of fact ... an officer's mistake of law, however reasonable, 'cannot provide the objective basis for reasonable suspicion or probable cause' needed to justify a search or seizure."); *United States v. Coplin*, 463 F.3d 96, 101 (1st Cir.2006) ("Stops premised on a mistake of law, even a reasonable good-faith mistake, are generally held to be unconstitutional."), *cert. denied*, 549 U.S. 1237, 127 S.Ct. 1320, 167 L.Ed.2d 130 (2007); *United States v. McDonald*, 453 F.3d 958, 961–62 (7th Cir. 2006) ("We agree with the majority of circuits to have considered the issue that a police officer's mistake of law cannot support probable cause.... It makes no difference that an officer holds an understandable or 'good faith' belief that a law has been broken.... A stop based on a subjective belief that a law has been broken, when no violation actually occurred, is not objectively reasonable."); *United States v. Tibbetts*, 396 F.3d 1132, 1138 (10th Cir.2005) ("Failure to understand the law by the very person charged with enforcing it is not objectively reasonable."); *United States v. Lopez–Soto*, 205 F.3d 1101, 1106 (9th Cir.2000) ("[T]here is no good-faith exception to the exclusionary rule for police who do not act in accordance with governing law. To create [such] an exception ... would defeat the purpose of the exclusionary rule, for it would remove the incentive for police to make certain that they properly understand the law that they are entrusted to enforce and obey.")); *accord United States v. Lopez–Valdez*, 178 F.3d 282, 289 (5th Cir.1999) (good-faith, though erroneous, belief that broken taillight violated Texas Transportation Code was unreasonable and does not justify good-faith exception to exclusionary rule because "potential for abuse of traffic infractions as pretext for effecting stops seems boundless and the costs to privacy rights excessive"); *United States v. Simon*, 368 F.Supp.2d 73, 79 (D.D.C.2005) ("Exclusion of the evidence ... serves the purpose of encouraging law enforcement officers to know the bounds of their authority, which ... is especially important since there is a 'fundamental unfairness [in] holding citizens to "the traditional rule that ignorance of the law is no excuse" while allowing those "entrusted to enforce" the law to be ignorant of it.' ").

43. *Staten*, 562 A.2d at 91; *see supra* text accompanying note 13. In *Staten*, this court summarized *Belton's* "two-pronged test" as follows: "(1) whether the police had probable cause to make the arrest and, if so, (2) whether the search of the automobile was a contemporaneous incident of that arrest." *Id.* at 91 (quoting *Smith v. United States*, 435 A.2d 1066, 1068 (D.C.1981) (citing *Belton*, 453 U.S. at 460–61, 101 S.Ct. 2860), *cert. denied*, 455 U.S. 950, 102 S.Ct. 1454, 71 L.Ed.2d 665 (1982)). There are other variables inherent in

cause *Chimel's* justifications for a warrantless search of the area under an individual's "immediate control"[44] (police officer safety and retrieval of disposable evidence)[45] had become problematic for courts to apply to individuals whom the police had lawfully rousted from automobiles of different sizes and configurations. What precisely was the so-called "grab" area inside the vehicle that corresponded to the area of danger and disposal within a particular occupant's "immediate control"?[46]

Writing for the Court in *Belton*, Justice Stewart noted that after *Chimel*, in *United States v. Robinson*,[47] the Court had "hewed to a straightforward rule, easily applied, and predictably enforced" authorizing a "full search of the person" incident to a "lawful custodial arrest."[48] *Robinson*, therefore, had rejected, in that context, the need for litigation of particular "reasons supporting the authority for a search."[49] The *Belton* Court concluded accordingly that a similar, "workable rule" unfettered by fact-parsing was necessary to govern auto compartment searches—especially to resolve the confusion encountered by police officers and judges in evaluating the legality of searches after a "recent occupant" had been removed from the car.[50] Thus came *Belton's* bright-line rule, limiting the facts that would be material to determining the constitutionality of a search.[51]

*Belton* did not end all legitimate inquiries concerning new material facts, however. This court, for example, held that an individual who had parked, locked, and walked fifteen to twenty feet away from his car was no longer an "occupant" within the scope of a lawful *Belton* search.[52] On the other hand, we held that a search conducted after a wait for a showup identification of the driver was a sufficiently "contemporaneous incident" of the arrest to satisfy *Belton*.[53] In both cases, however, we were construing the language of *Belton's* express holding;[54] we were not conducting a factual inquiry into application of *Chimel's* intendments.

satisfying a lawful search under *Belton*, including whether the arrestee qualifies as an "occupant" of the vehicle, *see supra* note 41, and whether search of the passenger compartment, including "open or closed" containers, extends to locked glove compartments. *See supra* note 13; *Staten*, 562 A.2d at 90–91; *Smith*, 435 A.2d at 1067–69; *Briscoe*, 422 Md. 384, 30 A.3d at 883. None of these other variables, however, is relevant here.

44. *Belton*, 453 U.S. at 460, 101 S.Ct. 2860 (quoting *Chimel*, 395 U.S. at 763, 89 S.Ct. 2034).

45. *See supra* note 15 and accompanying text.

46. *Belton*, 453 U.S. at 460, 101 S.Ct. 2860 (quoting *Chimel*, 395 U.S. at 763, 89 S.Ct. 2034).

47. 414 U.S. 218, 236, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973) (stating that authority to search arrestee arises from fact of custodial arrest).

48. *Belton*, 453 U.S. at 459, 101 S.Ct. 2860 (citing *Robinson*, 414 U.S. at 235, 94 S.Ct. 467).

49. *Id.* (citing *Robinson*, 414 U.S. at 235, 94 S.Ct. 467).

50. *Id.* at 460, 101 S.Ct. 2860.

51. *See supra* note 13 and accompanying text (quoting *Belton*: "when a policeman has made a[1] *lawful custodial arrest* of the [2] *occupant* of an automobile, he may, as a[3] *contemporaneous incident* of that arrest, search the passenger compartment of that automobile" including "open or closed" containers) (italics show material facts required to justify search).

52. *Lewis, supra* note 41.

53. *Smith, supra* note 23.

54. *See supra* text accompanying note 13.

As noted in *Debruhl I,* bright-line rules can easily fade as circumstances challenge their justification.[55] And, as we elaborated, *Belton* itself began to erode as courts concluded, on particular facts—notably handcuffed and sequestered occupants— that *Belton's* bright-line rule for searching an automobile passenger compartment was too sweeping for justification under *Chimel's* rationale.[56] Hence, eventually came *Thornton,*[57] revealing the Supreme Court's fracture over *Belton,*[58] and then *Gant,* recalibrating *Belton* to clarify and impose a discernible *Chimel* limitation upon warrantless automobile compartment searches.[59]

In *Debruhl I,* we were persuaded by pre-*Gant* rulings from other courts which had acknowledged the material change of fact from *Belton*—sequestration of the occupant—that justified a limitation on *Belton's* compartment search rule. And, we were satisfied that neither *Belton* nor *Staten* and *Harris* (both of which merely reflected the facts in *Belton* ) could bind this court to ignore the same factual change in *Debruhl.* After rehearing, however, based on splendid briefs and oral arguments by the parties and *amicus curiae,* we have concluded that we must approve the government's argument that the good-faith exception applies here, reject our ruling in *Debruhl I,* and reverse the trial court's suppression order.

## V.

◼ In order to determine whether a fact is "material" to a precedent on which a police officer relies for the good faith exception, we look, first, at the defendant's contention. In this case, Debruhl asserts that, for a precedent to be "settled" or "binding," its holding must have rejected the defense, successful in *Gant,* that *Belton* cannot be stretched to authorize the warrantless search of a car (here comes the material fact) after all the occupants have been securely sequestered. Second, we look at whether the government-proffered precedent incorporates that fact and, if not, whether there is, nonetheless, a sound basis for the government's argument that the precedent is binding. In *Staten* and *Harris,* on which the government principally relies, all agree that the alleged material fact—handcuffed sequestration as to all occupants—is missing. So, what does the government say next?

The government replies that *Staten* and *Harris* foreclose Debruhl's contention because both cases "explicitly held that *Belton* was not limited to its facts." In support, the government notes *Staten's* rejection of the appellant's argument that the record lacked evidence justifying *Chimel's* concerns that underlay *Belton* (officer safety and disposable evidence).[60] It then stresses *Harris's* rejection of the motion judge's reliance, in granting suppression, on "material factual differences" from *Belton,* including the lack of "reasonable fear" for officer safety.[61] In short, argues the government, this court twice has addressed and rejected Debruhl's contention that the decisional law of this jurisdiction, before *Gant,* allowed a court to narrow *Belton's* reach by reference to facts germane to *Chimel.*

---

55. *See supra* text accompanying note 17.

56. *See* cases cited *supra* note 17.

57. *See supra* note 41; *Debruhl I,* 993 A.2d at 582–83.

58. *See Debruhl I,* 993 A.2d at 583–84.

59. *See supra* note 5.

60. *Staten,* 562 A.2d at 92 n. 5.

61. *Harris,* 617 A.2d at 192.

These observations might have currency more easily if the factual scenarios in *Staten* and *Harris* differed in any significant—call it material—way from the facts in *Belton*. But they did not. Despite the defense proffers in *Staten* and *Harris* that the searches were unlawful because the facts revealed no concern for officer safety, *Staten* and *Harris*, like *Belton*, involved one or more occupants of a car who were not securely sequestered at the time of the search. Accordingly, neither in *Staten* nor in *Harris* did the facts permit this court, in reaching a decision, to distinguish the situation from *Belton* itself; in neither case did the trial court, let alone this court, have leeway to rule for the defendants based on the facts. Thus, rejection of the factual arguments proffered in *Staten* and *Harris* (we have called them "pure" *Belton* cases) [62] could not, as such, create a precedent that would foreclose a contention based on different facts in a later case—*Debruhl*—unless for some other reason *Belton* itself stood in the way.

## VI.

Although this court's rejection of the defendants' factual contentions in *Staten* and *Harris* did not, in itself, preclude a factual inquiry in other cases, we nonetheless reverse now for two reasons. This Part VI explains the first. If this case had arisen before *Gant*, we believe that our en banc court, like the Arizona Supreme Court in *Gant*,[63] would have had room to hold that *Belton's* reach did not extend to warrantless searches of automobiles after all occupants had been sequestered and secured. However, in light of this court's unequivocal affirmation in *Staten* and *Harris* that a *Belton* compartment search was limited by only two variables-probable cause and contemporaneity[64]-we must agree with the government that this court's precedent bound our division under *M.A.P. v. Ryan*[65] not to stray into factual territory that was otherwise ripe for rethinking.

We repeat our observation in Part V: the facts of *Staten* and *Harris* reflected the facts of *Belton*; thus, *Staten* and *Harris*, in rejecting factual arguments against a *Belton* search, did not, merely by reason of that rejection, foreclose application of *Belton* to another factual scenario, as in *Debruhl*. But the analysis cannot stop there. *Staten* and *Harris* offered interpretive pronouncements, broader than we initially credited, about *Belton's* factual reach. Those decisions made clear (without expressly stating) that the bright-line rule allowed for no limiting material facts beyond those identified in the plain language of *Belton's* holding; implicitly, therefore, sequestration was an immaterial fact.[66] For that reason, we now believe that it would bend *M.A.P.* too far to conclude, as we did earlier, that these unequivocal pronouncements do not extend to the *Gant*-type facts before the court in *Debruhl*. In sum, the interpretation of *Belton* in *Staten* and *Harris* that was in effect at the time of Debruhl's arrest constitutes "binding appellate precedent"[67] on which the police officers who arrested Debruhl could rely in objective good faith.

In recognizing the binding effect of a bright-line rule, without room for scrutiny

---

62. *Debruhl I*, 993 A.2d at 581.

63. *State v. Gant*, 216 Ariz. 1, 162 P.3d 640 (2007).

64. *But see supra* note 43 (recognizing occupancy as a third variable).

65. *Supra* note 35.

66. *See supra* text accompanying note 13; *see also supra* note 43.

67. *Davis*, 131 S.Ct. at 2434.

of the facts to which it is applied, we are doing so *only* for purposes of construing our obligation as a division of this court under *M.A.P. v. Ryan,* and thus for determining "binding appellate precedent" for purposes of the good-faith exception to the exclusionary rule under *Davis.* In no way are we saying that bright-line rules are exempt from judicial scrutiny for unlawful—often unconstitutional—application to facts not contemplated, or improvidently considered, when the rule was announced. *Gant* itself is a typical example of constitutional reevaluation of such a rule, just as this court's recent en banc decision in *Hedgepeth v. Whitman–Walker Clinic*[68] is an example of common law reevaluation of a previously bright-line negligence rule.

Normally, moreover, binding precedent is limited to case law controlled and distinguished by facts, not (as in *Belton*) by bright-line rules that subordinate the facts to an unbending pronouncement.[69] Finally, even recognition of a bright-line rule does not derogate from the settled material facts rule [70] we relied on in *Debruhl I* to determine binding appellate precedent. A bright-line rule is merely a generalization describing a fact-bound universe—in *Belton's* case, all automobile compartment searches limited by probable cause,[71] occupancy,[72] and contemporaneity.[73] Ultimately, all binding precedent is determined by reference to settled material facts that justify the court's decision.[74] Thus, we reaffirm that analysis in *Debruhl I.*

**68.** 22 A.3d 789 (D.C.2011) (en banc) (modifying zone of physical danger rule governing recovery for negligent infliction of emotional injury in *Williams v. Baker,* 572 A.2d 1062 (D.C.1990) (en banc)).

**69.** Not long ago, in *Central Va. C'mty College v. Katz,* 546 U.S. 356, 363, 126 S.Ct. 990, 163 L.Ed.2d 945 (2006), the Supreme Court emphasized that statements in judicial opinions are limited by the facts to which they relate. "For the reasons stated by Chief Justice Marshall in *Cohens v. Virginia,* 19 U.S. 264, 6 Wheat. 264, 5 L.Ed. 257 (1821), we are not bound to follow our dicta in a prior case in which the point now at issue was not fully debated. *See id.* at 399–400 ('It is a maxim not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision.')." *Id.* at 363, 126 S.Ct. 990. Earlier, in *Armour & Co. v. Wantock,* 323 U.S. 126, 132–33, 65 S.Ct. 165, 89 L.Ed. 118 (1944), the Court had stressed: "It is timely again to remind counsel that words of our opinions are to be read in the light of the facts of the case under discussion. To keep opinions within reasonable bounds precludes writing into them every limitation or variation which might be suggested by the circumstances of cases not before the Court." This court has

made similar observations. In *Kraft v. Kraft,* 155 A.2d 910, 913 (D.C.1959), we noted: "It is well to remember that significance is given to broad and general statements of law only by comparing the facts from which they arise with those facts to which they supposedly apply." We have cited one or more of the foregoing statements in other decisions of this court. *See Jackson v. District of Columbia Bd. of Elections & Ethics,* 999 A.2d 89, 99 n. 13 (D.C.2010) (en banc) (citing *Katz,* 546 U.S. at 363, 126 S.Ct. 990); *United States v. Alston,* 580 A.2d 587, 594 n. 12 (D.C.1990) (citing *Armour,* 323 U.S. at 132–33, 65 S.Ct. 165; *Kraft,* 155 A.2d at 913), *cert. denied,* —— U.S. ——, 131 S.Ct. 1001, 178 L.Ed.2d 827 (2011); *Khiem v. United States,* 612 A.2d 160, 164 (D.C.1992) (citing *Armour,* 323 U.S. at 132–33, 65 S.Ct. 165; *Kraft,* 155 A.2d at 913; *Alston,* 580 A.2d at 594 n. 12), *cert. denied,* 507 U.S. 924, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993).

**70.** *See supra* note 10.

**71.** *See Hicks,* 730 A.2d at 661–62.

**72.** *See Lewis,* 632 A.2d at 387–88, and discussion *supra* notes 41 and 43.

**73.** *See Smith,* 435 A.2d at 1069.

**74.** *See Debruhl I,* 993 A.2d at 585 (describing material facts as "handful of variables" that

## VII.

In addition to our protective search jurisprudence under *Belton*, reflected in *Staten* and *Harris*, the government urges a second reason for concluding that the facts in *Debruhl* do not undermine reliance by police officers on *Belton* to justify the good-faith exception. In *Staten*, the court relied on *Smith*,[75] our first decision to invoke *Belton* (which was decided during the course of Smith's appeal). Unlike *Staten*, *Harris*, and now *Debruhl*—all protective search cases—*Smith* was a showup case in which the occupant had been sequestered awaiting arrival of an eyewitness who eventually identified him as the person who had committed an assault. This court cited *Belton* to justify the eventual search of the suspect's car, rejecting the defense contention that the search had not been sufficiently contemporaneous with the arrest.[76] Later, we cited *Belton* without discussion in *Hicks*,[77] another showup case, to justify a search of the occupant's car. This time the focus was almost entirely on our analysis concluding that an unlawful search could be cured by the inevitable discovery doctrine.[78] Neither *Smith* nor *Hicks* discussed whether reliance on *Belton* in the context of a showup, not a protective search, was valid—manifestly a context ripe for a *Gant*-type argument that was never made (either at division or en banc). Moreover, in both cases the auto-

police officers take into account in ascertaining lawful *Belton* search).

75. *Supra* note 23.

76. In *Smith*, *supra* note 23, a police officer in a patrol car received a radio lookout for a light Ford Granada involved in an assault six blocks away. The officer soon saw a car, as described, driving in a "bizarre" manner. The officer stopped the car, frisked the driver, and looked through the window but saw nothing unlawful in plain view inside the car. He called for backup and received confirmation that the car "should have a gun in it." The officers drove the Granada and the suspect, separately, several blocks away for a showup, where the victim positively identified the appellant. At this point, the appellant was formally arrested, the Granada was searched, and a gun was found. This court confirmed probable cause to arrest and, citing *Belton*, sustained the search as a "contemporaneous incident" of the arrest.

77. *Supra* note 24.

78. In *Hicks*, *supra* note 24, after a street robbery by an assailant carrying what appeared to be a pipe wrapped with a cord, the police broadcast a lookout for a station wagon carrying the assailant and two other men. Five blocks from the robbery, an officer recognized a likely vehicle and called for backup. Together the officers stopped the station wagon, removed and handcuffed the occupants, searched the vehicle, found a sawed-off shotgun, and sequestered the occupants in a police van to await a showup, which occurred fifteen minutes later and yielded a positive identification of the appellant. The trial court concluded that the police had made a valid investigatory stop but ruled that because the shotgun had not been in plain view, *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), did not permit the ensuing search and seizure. However, the trial court upheld admission of the unlawfully seized evidence under the doctrine of inevitable discovery. *See Nix v. Williams*, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). This court agreed that the shotgun had been seized unlawfully. We also agreed that because the police conceded that the occupants would have remained in custody based on the shotgun, regardless of the outcome of the showup, they were held under unlawful arrest. After appellant was identified at the showup, however, triggering belated probable cause to arrest, the police would have achieved a valid basis to arrest and, under *Belton*, to search the car and find the shotgun. That discovery would have been without taint, we said, because a weapon had not been mentioned in the broadcast of the lookout, nor had the shotgun been revealed to the officer who escorted the victim to the showup. Accordingly, we held, lawful discovery of the shotgun would have been inevitable, and thus the gun was properly admitted in evidence under *Nix*.

mobile exception would have permitted a warrantless search of the automobile;[79] *Belton* was not an indispensable citation. And yet in *Smith* and *Hicks*, after our respective resolutions of the contemporaneity and inevitable discovery issues, this court needed authority to justify entry into the car and the ensuing search. For whatever reason, most likely the briefing,[80] the court picked *Belton.*

*Amicus curiae* embraces our rejection in *Debruhl I* of *Smith* and *Hicks* as authority justifying the good-faith exception.[81] *Amicus* argues that, in the way *Smith* and *Hicks* unfolded,[82] the court's "judicial mind" in citing *Belton* was not "applied to" a sequestration issue.[83] That issue, *amicus* cautions, was "never brought to the attention of the court"; it "merely lurk[ed] in the record."[84] Accordingly, concludes *amicus,* the indispensability of *Belton* to the decisions in *Smith* and *Hicks* does not mean that those

decisions should be given "precedential weight" on the question of sequestration.[85]

The cases relied on by *amicus,* primarily *Murphy* and *Sierra Club,* were decisions reflecting challenges to the court's authority to resolve the parties' disputes. In both cases, the opposing party argued that the jurisdictional issue had implicitly been decided in its favor in an earlier case as a necessary predicate to the decision on the merits. This court disagreed, however, because in both of the earlier cases the issue had not been raised and joined. On each occasion, therefore, we ruled on the issue *de novo.*[86] In *Sierra Club,* for example, we stressed that a " 'point of law merely assumed in an opinion, not discussed, is not authoritative.' . . . This is especially true with respect to jurisdictional issues, for 'when questions of jurisdiction have been passed on in prior decisions *sub silentio,* this court has never considered itself bound when a subsequent case finally brings the jurisdictional issue be-

---

79. *See, e.g., Shreeves v. United States,* 395 A.2d 774, 785 (D.C.1978) (citing *Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925)), *cert. denied,* 441 U.S. 943, 99 S.Ct. 2161, 60 L.Ed.2d 1045 (1979).

80. *See* Brief for the United States in *Hicks, supra* note 24, No. 96–CF–956, filed July 28, 1998, at 35, 37.

81. 993 A.2d at 681 n. 55.

82. *See supra* notes 76 and 78.

83. *Murphy,* 650 A.2d at 205, *quoted in Sierra Club,* 670 A.2d at 360, and *Umana,* 669 A.2d at 720.

84. *Murphy,* 650 A.2d at 205.

85. *Umana v. Swidler & Berlin, Chartered,* 669 A.2d 717, 720 n. 9 (D.C.1995).

86. *See* cases cited *supra* notes 38 & 39. *Amicus* also relies on a third case addressing

whether prior case law had decided particular questions about this court's jurisdiction and the District Council's legislative authority. In *Umana, supra* note 85, after raising the jurisdictional issue *sua sponte,* we noted that despite arguments to the contrary, none of our cases had decided whether the District of Columbia Arbitration Act conferred jurisdiction on this court in *Umana's* circumstances ("where no judgment has been entered with respect to some of the parties to the action"). 669 A.2d at 720. Nor, we said, in applying the Arbitration Act in nine cited cases, had we ever decided whether the Council had authority under the Home Rule Act to adopt the Arbitration Act, even though prior cases had relied upon the Arbitration Act for jurisdiction in other contexts. 669 A.2d at 718–19 & n. 7, 720. Ultimately, the *Umana* court, relying in part on *Murphy, supra* note 38, and *Webster, supra* note 39, held that this court lacked jurisdiction under the Arbitration Act, and thus that the court need not resolve the Council's authority under the Home Rule Act.

fore us.' " [87]

In *Smith* and *Hicks,* the facts the parties deemed material in addition to probable cause were those addressed, respectively, to contemporaneity and inevitable discovery, not to the occupants' situations awaiting a showup. Without doubt, in upholding the searches in those two cases, the court's "judicial mind" was not at all focused on whether sequestration of a car's occupants affected the legitimacy of a *Belton* search. Furthermore, although in *Sierra Club* (relying on *Murphy* ) we were particularly concerned that jurisdictional issues not be decided implicitly, we have never limited our concern about *sub silentio* decision-making to issues of judicial power.[88]

On the other hand, in each of the cases on which *Amicus* relies—*Murphy, Sierra Club,* and *Umana*—the earlier decision that we said had not implicitly resolved an issue was a decision that merely had assumed a legal proposition without challenge. In *Smith* and *Hicks,* to the contrary, this court did not merely assume that *Belton* applied to the search on the court's way to decision; we employed *Belton* affirmatively to refute a challenge to the search—to provide authority for the warrantless entry. We were saying that, on these facts (which included sequestra-

tion for a showup), *Belton* allows the police to enter the car.

Moreover, the argument that sequestration was not resolved in the showup cases is eclipsed by the reality that *Smith* itself is the source from this court for *Staten's* "two-pronged test" describing *Belton's* broad reach that we now recognize in Part VI as binding appellate precedent.[89] By extending *Belton's* bright-line rule beyond a protective search to a search after a showup, *Smith* irrefutably made the degree of sequestration a non-issue. Vis-a-vis *Staten* and *Harris,* our decision in *Smith* (later reflected in *Hicks* ) creates *a fortiori* the settled law-binding appellate precedent—that justified a *Belton* search on *Gant*-type facts, and thus permits the good-faith exception, in *Debruhl.*

\*   \*   \*   \*   \*   \*

We reverse and remand for further proceedings.

*So ordered.*

---

**87.** *Sierra Club,* 670 A.2d at 360 (quoting *Murphy,* 650 A.2d at 205).

**88.** *See, e.g., Thompson v. United States,* 546 A.2d 414, 423 n. 14 (D.C.1988) ("[T]he question whether the defendant must meaningfully

controvert intent before the intent exception can apply was not raised in [previous cases].").

**89.** *See supra* note 43.