*Notice:  This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters.  Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

**DISTRICT OF COLUMBIA COURT OF APPEALS**

No. 13-AA-01

ROUZBEH E. MAZANDERAN, PETITIONER,

v.

DISTRICT OF COLUMBIA DEPARTMENT OF PUBLIC WORKS, RESPONDENT.

On Petition for Review of an Order
of the Office of Administrative Hearings
(DPWK-514405-12)

(Submitted February 13, 2014                    Decided July 10, 2014)

Rouzbeh Mazanderan, *pro se.*

*Irvin B. Nathan*, Attorney General for the District of Columbia, *Todd S. Kim*, Solicitor General, and *Gregory M. Cumming*, Assistant Attorney General, were on the brief for respondent.

*John C. Keeney, Jr.* and *William M. Doolittle* were on the brief for *amicus curiae* The Legal Aid Society of the District of Columbia, in support of petitioner.

Before FISHER and BECKWITH, *Associate Judges*, and FERREN, *Senior Judge*.

FERREN, *Senior Judge*:  Rouzbeh E. Mazanderan asks us to review a final order of the Office of Administrative Hearings (OAH) holding him liable for a civil fine under 24 DCMR § 1002.1 (1989) for maintaining a "Nuisance Vacant Lot."  Mazanderan denies that there was any forbidden litter or debris on his lot

when he received the original Notice of Violation, and asserts that the notice cited him only for overgrown weeds not covered by the regulation. We directed the parties to submit supplemental briefing as to whether an overgrowth of weeds alone violates 24 DCMR § 1002.1. Concluding that it does not, we reverse the administrative law judge's order and remand the case to OAH to determine whether the evidence of other debris on Mazanderan's lot is sufficient support for the original notice of violation.

We arrive at reversal after reviewing two parallel—though conflicting—approaches which have emerged over the years for controlling weeds on vacant lots. These two distinct administrative enforcement schemes, still in effect, are derived from different statutes enacted in the late 19th century. The provision applied to Mazanderan here, 24 DCMR § 1002.1, is enforced under the Litter Control Administration Act of 1985 ("1985 Litter Control Act")[1] and mandates a fine immediately upon the notice of violation. The other provision, D.C. Code § 8-301 (2012 Repl.), enforced under the Department of Consumer and Regulatory Affairs Civil Infractions Act of 1985 ("1985 Civil Infractions Act"),[2] affords the

---

[1] D.C. Law 6-100, §§ 4-5, 33 D.C. Reg. 781 (1986) (codified as amended at D.C. Code §§ 8-801 to -810 (2012 Repl.)).

[2] *See* D.C. Law 6-42, § 471, 32 D.C. Reg. 4450 (1985).

violator an abatement period within which to cure the violation before a fine is imposed. The latter, abatement statute expressly applies to overgrown weeds "four or more inches in height," whereas the former, non-abatement regulation for which Mazanderan was cited, applies only to weeds that are "thrown" or "deposited" onto the property. Because this case concerns only overgrown, uncut weeds, Mazanderan was cited for the wrong violation, and thus was wrongly denied the abatement period to which he was entitled under the statute he actually violated.

## I.

On June 8, 2012, a Department of Public Works (DPW) inspector issued a notice charging Mazanderan with the aforementioned violation and instructing him to

> please clean your vacant lot and cut all weeds on your vacant lot. Keep your vacant lot clean at all times. Thank you. . . . Cut all Vegetation/Overgrowth from The Entire Property And Properly Dispose.

Mazanderan denied the violation and requested a hearing, but he did not appear on the scheduled hearing date, November 14, 2012.[3] Rather than enter a default

---

[3] The hearing was originally scheduled for September 11, 2012, but was rescheduled to November 14 at Mazanderan's request. The notice of rescheduling

(continued . . .)

judgment, the administrative law judge proceeded to a hearing on the merits. The inspector testified that when he had visited the property he noticed "a lot of overgrowth of weeds and also some debris." He added that the lot had been "like that for a good while." He also presented three photos showing overgrown weeds both inside and outside a chain link fence around the property, as well as two unidentifiable light-colored items, one inside the fence, the other outside. When he re-inspected the property twelve days later, he observed that the lot was "already clean" and cleared of weeds as the notice had instructed. The final order, issued December 18, 2012, concluded that the testimony and photographs, evidencing "overgrown grass and weeds interspersed with litter and debris," established that "the property is a vacant lot" that was "littered with solid waste on June 8, 2012," and thus that petitioner had violated 24 DCMR § 1002.1 as charged.[4] The judge

---

(. . . continued)
was sent by first class mail to the address listed on his request for a continuance, and it was not returned undelivered.

[4] DPW argues that we can affirm OAH's decision simply on the basis of evidence of litter and debris other than the weeds growing on Mazanderan's lot. As elaborated below in part V, however, the record contains scant evidence for the judge's finding that the lot was "littered with solid waste," as that phrase is defined in 21 DCMR § 799.1 (1996). Nor, in any event, did the judge expressly find that this waste alone was sufficient to constitute a violation.

imposed a $300 fine for the violation and an additional $300 penalty for failure to appear at the hearing.[5] Mazanderan asks us to dismiss both.

## II.

### A.

The central question in this appeal is whether a person who allows uncut, overgrown weeds to remain on his or her vacant lot violates 24 DCMR § 1002.1, which provides:

> 1002.1 No person shall throw, deposit, or cause to be thrown or deposited, on any vacant lot or open space in the District any of the following:
>
> (a) sawdust, shavings, vegetable matter, *weeds*;
> (b) paper, rubbish, litter, garbage;
> (c) offal, dead animal or putrescible matter of any sort;
> (d) *an abandoned vehicle, or any other solid waste refuse as defined in 21 DCMR § 799.1*[6]; or
> (e) any other thing that is injurious to public health.

---

[5] The order indicates that the penalty is "FOUR HUNDRED AND FIFTY DOLLARS ($600)"; presumably $600 is intended.

[6] 21 DCMR § 799.1 (1996) defines "solid waste refuse" as "putrescible and nonputrescible solid wastes, except body wastes, and including abandoned vehicles, food waste (garbage), rubbish, ashes, incinerator residue, street cleanings, tree debris, and solid market and industrial wastes."

> 1002.2  *Nor shall a deposit be permitted to remain on a vacant lot or open space.*[7]

These regulations are traceable to police regulations originally authorized in 1887 by the congressionally-appointed Commissioners of the District of Columbia and date from at least 1906.[8]  The Council of the District of Columbia added the italicized language, including the references to weeds, in the District of Columbia Solid Waste Regulations Amendment Act of 1989 ("1989 Solid Waste Regulations

---

[7]  The judge's order states that the language in § 1002.2 is actually part of § 1002.1 because the Council passed both as a single provision that was mistakenly codified in two parts.  According to the judge, therefore, even though the notice of violation cited only § 1002.1, it should be understood to include a reference to § 1002.2 as well.  We agree.  The version as passed by the Council controls.  *See Sheetz v. District of Columbia*, 629 A.2d 515, 519 (D.C. 1993) ("The law as enacted must prevail over the regulation as incorrectly and improvidently published.").

[8]  *See* Act of Congress of January 26, 1887, 24 Stat. 368, 368, ch. 49, § 1 (codified at D.C. Code § 3-303.01 (2012 Repl.)) (authorizing Commissioners of the District of Columbia to make police regulations).  These regulations include a precursor to § 1002.1.  *See* Police Regulations of the District of Columbia, art. 8, § 2 (1906) ("No person shall throw, or deposit, or cause to be thrown or deposited, in or upon any vacant lot or open space in the District of Columbia, any sawdust, shavings, vegetable matter, paper, rubbish, litter, dead animal, offal, garbage, putrescible matter of any sort, or any other matter or thing injurious to public health.").

Amendments Act"),[9] which also added two new definitions to 21 DCMR § 799.1 (1996),[10] as incorporated into § 1002.1:

> Clean condition—free of litter, debris, and weeds
>
> Weeds—uncultivated or wild vegetation that is greater than four inches in height.

**B.**

Before considering this regulatory language, and especially because, as noted earlier, a parallel regulatory scheme is germane to our analysis, it is important to explain our standard of review and the manner in which we address this larger regulatory context.

Our review of an OAH order is limited, and thus we affirm when: (1) the Administrative Law Judge has made findings of fact on each materially contested issue of fact; (2) each finding is supported by substantial evidence; and (3) the judge's legal conclusions flow rationally from the findings of fact, and are not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

---

[9] D.C. Law 8-31, § 4 (e), 36 D.C. Reg. 4750 (1989).

[10] See *supra* note 6.

law.[11]  The proper construction of a statute or regulation presents a legal issue that we review *de novo*.[12]  When a statute or regulation is ambiguous, we defer to the reasonable interpretation of the agency charged with enforcement, provided that the interpretation is consistent with the statute's language and purpose.[13]  Statutory interpretation is a "holistic endeavor."[14]  We begin with the statute's plain language and give effect to that language if it is clear and unambiguous.[15]  But we recognize that even where statutory language has a superficial clarity, a detailed consideration of other factors, such as the specific context in which that language is used and the broader context of the statute as a whole, when viewed in light of the statute's legislative history, may reveal ambiguities that this court must

---

[11]  *See District of Columbia Dep't of the Env't v. E. Capitol Exxon*, 64 A.3d 878, 880 (D.C. 2013).

[12]  *See Washington v. District of Columbia Dep't of Public Works*, 954 A.2d 945, 948 (D.C. 2008).

[13]  *See E. Capitol Exxon*, 64 A.3d at 880-81; *see also O'Rourke v. District of Columbia Police and Firefighters' Ret. & Relief Bd.*, 46 A.3d 378, 383 (D.C. 2012) ("We owe no deference where the administrative body has not considered the policy underlying the statute and has reached a result that is contrary to the purpose of the legislation and not reasonable.").

[14]  *Cook v. Edgewood Mgmt. Corp.*, 825 A.2d 939, 946 (D.C. 2003) (quoting *United States Nat'l Bank of Oregon v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 455 (1993)).

[15]  *See Adgerson v. Police & Firefighters Ret. & Relief Bd.*, 73 A.3d 985, 991 (D.C. 2013).

resolve.[16]  Finally, when our review of the broader context of the statute reveals another statute that is arguably inconsistent with it, we interpret both provisions *in pari materia*, that is, as if they were passed by a single legislature.[17]  We are obliged to give effect to both provisions if possible, and thus repeals by implication are disfavored.[18]  But we will recognize an implied repeal if there is a clear legislative intention to repeal, or if the statutes themselves are "irreconcilable," that is, "so inconsistent that the two cannot have concurrent operation."[19]

## III.

## A.

In examining the broader context of potentially applicable statutes, we cannot assuredly interpret 24 DCMR § 1002.1 without accounting for the original plan of Congress to combat overgrown weeds in the District dating from the Act of

---

[16]  *See id.*

[17]  *See United States Parole Comm'n v. Noble*, 693 A.2d 1084, 1087 (D.C. 1997), *adopted en banc*, 711 A.2d 85 (D.C. 1998).

[18]  *See id*. (quoting *United States v. Borden Co*., 308 U.S. 188, 198 (1939)).

[19]  *See id.* (quoting *Speyer v. Barry*, 588 A.2d 1147, 1165 (D.C. 1991)).

March 1, 1899 ("1899 Act").[20] This plan, still substantially in effect,[21] applies to "any land in the City of Washington" and requires property owners or tenants to trim weeds "four or more inches in height" within seven days (excluding Sundays and holidays) after notice of the violation.[22] Under this original plan, violators

---

[20] *See* Act of March 1, 1899, ch. 326, § 1, 30 Stat. 959 (codified as amended at D.C. Code § 8-301 (2012 Repl.)), which provides:

> It shall be the duty of the owner, occupant, or agent in charge of any land in the City of Washington, or in the more densely populated suburbs of said city, to remove from such land any weeds thereon of four or more inches in height within seven days (Sundays and legal holidays excepted) after notice from the Director of the Department of Human Services so to do, and upon failure to comply with such notice he or she shall, on conviction thereof, be punished by a fine of not more than $10 for each day said notice is not complied with. *Civil fines, penalties, and fees may be imposed as alternative sanctions for any infraction of the provisions of this chapter, or any rules or regulations issued under the authority of this section pursuant to Chapter 18 of Title 2. Adjudication of any infraction of this section shall be pursuant to Chapter 18 of Title 2.*

The italicized language was added by the 1985 Civil Infractions Act, see *supra* note 2. This 1985 Act established the enforcement scheme provided in Chapter 18 of Title 2, captioned "Administrative Review of Civil Infractions," D.C. Code §§ 2-1801.01 to -1803.03 (2012 Repl.). *See* 1985 Civil Infractions Act, §§ 201-205 and 301-303.

[21] *See id.* Amendments to the original 1899 Act provide only for administrative enforcement of infractions; the substantive weed control provision remains as it was originally.

[22] *See id.*

were subject to criminal and civil penalties.[23] The 1899 Act also provided that if overgrown weeds on vacant lots were not removed within the abatement period specified in the original notice, the District itself would remove the weeds and place a lien on the property for double the cost of removal.[24]

In the 1985 Civil Infractions Act,[25] however, the Council amended the 1899 Act, as now codified at D.C. Code § 8-301,[26] to simplify enforcement by putting it in the hands of administrative agencies and establishing a new enforcement scheme

---

[23] See *supra* note 20. Before enactment of the 1985 Civil Infractions Act and other roughly contemporaneous acts, civil infractions were routinely enforced with the same procedures used for enforcement of criminal laws, which may have resulted in lax enforcement. *See Hearing on the Litter Control Act of 1985 Before the Comm. On Public Works* (October 30, 1985) (statement of Anne Hoey, Administrator of the Public Space Maintenance Administration, Department of Public Works) ("The Metropolitan Police Department has authority over [public space and sanitation regulations]. However, the violations are now criminal offenses, and persons charged are required to present their case in criminal court. This requires that the ticket be issued and investigated in the same manner as any other criminal case. Prosecution requires that the Office of the Corporation Counsel prepare the case and present it in Superior Court. However, the police, the Corporation Counsel, and the court, with the heavy burden of other serious crimes, do not have the time to deal effectively with these offenses.").

[24] *See* 1899 Act, ch. 326 § 2, 30 Stat. 959 (codified at D.C. Code § 8-302 (2012 Repl.)).

[25] See *supra* note 20.

[26] See *supra* note 20.

codified at Title 2, Chapter 18, of the D.C. Code, §§ 2-1801.01 through 1803.03.[27]

Under that new enforcement scheme, still current, the District issues a notice of infraction, which the violator answers by: (1) admitting the violation; (2) admitting the violation "with explanation" and electing a hearing; or (3) denying the violation and appearing for a hearing.[28] For certain infractions, violators are subject immediately to a fine based on the original notice, but for others— including overgrown weeds—the violator has an abatement period within which to comply and avoid a fine.[29] If a statute or regulation now covered under the 1985 enforcement scheme previously gave violators a specific time period within which to cure an infraction, the 1985 scheme does not reduce it.[30] Because the original

---

[27] See *supra* note 20.

[28] *See* D.C. Code § 2-1802.02 (a) (2012 Repl.).

[29] *See* D.C. Code § 2-1802.01 (b)(4) (2012 Repl.) ("[T]he Mayor shall prepare the notice of infraction, which shall contain, . . . where appropriate, the date by which the respondent must comply to avoid incurring a fine or penalty.").

[30] D.C. Code § 2-1802.02 (g) (2012 Repl.) ("No notice of infraction issued pursuant to [D.C. Code §§ 2-1801.01 through 1802.05] shall abridge or abrogate any time periods established by the laws and regulations amended by Title IV [of the 1985 Civil Infractions Act] regarding cure of an infraction."). Section 2-1802.02 (g) was amended in 1989 to clarify that the time period it refers to is the time period the original statute or regulation allowed violators to cure the infraction before a ticket would be issued. *See* Department of Consumer and Regulatory Affairs Civil Infractions Act of 1985 Technical and Clarifying Amendments Act of 1989, D.C. Law 8-237, § 2 (h), 38 D.C. Reg. 314 (1991), *see also Hearing on the Civil Infractions Act of 1985 Technical and Clarifying Amendments Act of 1989, Bill 8-203, before the Committee on Consumer and*

(continued . . .)

weed control provision gave violators seven days to abate before they were fined,[31] the 1985 Civil Infractions Act preserves this abatement period.

Despite the Council's efforts through the 1985 legislation to bring the 1899 congressional plan for weed control under the new administrative enforcement scheme, the substance of that nineteenth-century legislation has not survived the transition with clarity. Pursuant to a 1986 Mayor's order, enforcement of § 8-301 under the 1985 Civil Infractions Act was transferred to the Department of Consumer and Regulatory Affairs (DCRA),[32] which has a wide range of responsibilities. DCRA enforces consumer protection laws, issues building permits and licenses, regulates businesses, and inspects residential properties for

---

(. . . continued)
*Regulatory Affairs* (September 28, 1989) (statement of Cassandra Sneed Ogden, Chief of the Office of Civil Infractions) ("This amendment [of D.C. Code § 2-1802.01 (g)] ensures that the time period set to cure an infraction prior to the issuance of the ticket will not change. After this time has expired, anyone who is issued a ticket will have fifteen days to file an answer. This establishes a uniformity of implementation without abrogating the right of all persons to cure a defect prior to a ticket being issued.").

[31] See *supra* note 20.

[32] *See* Mayor's Order 86-38, 33 D.C. Reg. 1823 (1986) (delegating enforcement under the 1985 Civil Infractions Act to DCRA). This order was intended to override a provision in § 8-301 that the Department of Human Services would enforce it. See *supra* note 20.

Housing Code violations.[33] Pertinent here, the Housing Code and other regulations under Title 14 of DCMR currently authorize DCRA to control weed growth on residential properties during the course of housing inspections—but only in that limited, housing sphere of operation.[34] That includes enforcement of District

---

[33] DCRA was created in 1983 pursuant to a mayoral reorganization plan to "protect the health, safety and welfare of the citizens of the District of Columbia by regulation of business activities, land and building use, professional conduct and standards, rental housing and condominiums, health and social service care facilities, and the physical environment of the District of Columbia." *See* Reorganization Plan No. 1 of 1983, D. C. Code D. I, T. I, Ch. 15, Subch. VI, Pt. A, 1983 Plan 1.

[34] *See* 14 DCMR § 800.10 (2011) (prohibiting on premises of residential properties "vegetative growth that exceeds ten inches in height or is untended" or that for other reasons is "detrimental to the health, safety, or welfare of the public"). Other longstanding housing regulations that allowed inspectors to collect collateral from persistent violators of the Housing Code explicitly provided that collateral could be collected for violations of D.C. Code § 8-301. *See* 14 DCMR § 108.4 (2010) ("[T]he Director may, with respect to residential property, enforce the following requirements as they are discovered in the course of standard housing inspections by using the procedure authorized in this section: . . . (b) *[r]emoval of weeds . . .* D.C. Official Code §§ 8-301, 8-302 (2001*).*") (emphasis added). In 2011, that provision was amended to identify 14 DCMR § 800.10, rather than D.C. Code § 8-301, as the prohibition on overgrown weeds that inspectors could enforce. *See* 58 D.C. Reg. 4910 (2011). On May 14, 2014, DCRA issued a proposed rulemaking that would repeal Subtitle A of Title 14 of the DCMR, which includes § 108.4, and replace it with new provisions that clarify enforcement procedures for Housing Code violations. *See* 61 D.C. Reg. 4969 (2014). Those proposed regulations repeal § 108 in its entirety. Thus, even though the 1985 Civil Infractions Act brought § 8-301 under the new administrative enforcement scheme and the 1986 Mayor's order (see *supra* note 32) authorized DCRA to enforce it, DCRA appears to see itself as policing overgrown weeds under 14 DCMR § 800.10.

regulations to prevent abandoned buildings and the lots on which they sit from becoming nuisances,[35] but DCRA does not inspect vacant lots, a function now within DPW's purview alone.[36]

In transferring enforcement authority over § 8-301 to DCRA, the 1986 Mayor's order did not purport to expand DCRA's enforcement activities to cover vacant lots, but that authority is apparent nonetheless from the language of § 8-301 itself, which covers "any land in the City of Washington."[37] That said, however, a second 1986 Mayor's order[38] authorized DPW, not DCRA, to police vacant lots under a parallel, though different, statutory scheme of weed control—the one applied to Mazanderan in this case—traceable (as we have noted) to police regulations originally authorized in 1887.[39] The weed control regulation applicable

---

[35] *See* D.C. Code § 42-3131.10 (2012 Repl.).

[36] In 1971, the Department of Environmental Services was created and tasked, among other things, with inspections of vacant lots. *See* Commissioner's Order 71-255 (1971). Reorganization Plan No. 4 of 1983, which became effective March 1, 1984, created DPW and transferred that function to it. *See* D. C. Code D. I, T. 1, Ch. 15, Subch. VI, Part D, 1983 Plan 4.

[37] See *supra* note 20.

[38] *See* Mayor's Order 86-160, 33 D.C. Reg. 6843 (1986).

[39] See *supra* note 8 and accompanying text.

here, § 1002.1, was added to the DCMR in 1979[40] and remained there, as the Commissioners of the District of Columbia originally drafted it, until the Council enacted the Litter Control Act of 1985, as codified in Title 8 of the D.C. Code.[41] These Title 8 provisions[42] authorize an administrative enforcement scheme, used for pollution and litter infractions, that is similar to the regime spelled out in Chapter 18 of Title 2 applicable under the 1985 Civil Infractions Act implementing § 8-301.[43] Under the 1985 Litter Control Act, as under the 1985 Civil Infractions Act, the District may issue a notice of violation and serve it on the owner or responsible party, who can respond in one of three ways: admit the violation, admit with explanation, or deny.[44] And, as we have noted, the two enforcement schemes materially differ in only one—though clearly significant—respect: § 8-301 grants an abatement period before a fine is imposed, whereas § 1002.1 does not.

---

[40] *See* District of Columbia Documents Act, D.C. Law 2-153, § 302, 25 D.C. Reg. 6960 (1979).

[41] See *supra* note 1.

[42] *See* D.C. Code § 8-801 (2012 Repl.) ("[T]he purpose of this chapter is to provide civil sanctions and to eliminate criminal liability for violating a variety of local laws and rules, to provide for civil enforcement of these violations, and to establish an expeditious administrative adjudicative system.").

[43] See *supra* note 20.

[44] D.C. Code § 8-804 (a) (2012 Repl.).

Under the 1986 Mayor's orders, therefore, DCRA had indirect authority through the language of § 8-301 to limit the growth of weeds on vacant lots to less than four inches, whereas DPW had express authority to enforce § 1002.1 on vacant lots by curbing the weeds "thrown or deposited" there. The obvious territorial, if not jurisdictional, issue was addressed by another Mayor's order in 2002. That order, however, did not assign vacant lot authority exclusively to DCRA or to DPW. To the contrary, it authorized DPW, DCRA, and several other agencies to enforce regulations covered by several statutes, including the 1985 Civil Infractions Act (§ 8-301 enforcement) and the 1985 Litter Control Act (embracing § 1002.1).[45] The 2002 Mayor's order gave DPW and DCRA authority to enforce both § 8-301 and § 1002.1 on vacant lots. As a result, it appears that the agencies themselves can allocate enforcement responsibilities under this order, and that DPW, having assumed full authority over vacant lots, ostensibly has discretion for the first time—albeit without prescribed guidelines—to enforce weed control as an abatement (§ 8-301) or a non-abatement (§ 1002.1) violation. That dual enforcement authority, however, does not resolve whether § 1002.1, like § 8-301,

---

[45] *See* Mayor's Order 2002-5, 49 D.C. Reg. 911 (January 11, 2002) (jointly delegating enforcement authority over the 1985 Litter Control Act, the 1985 Civil Infractions Act, and three other acts to DCRA, DPW, the Department of Health, the Alcoholic Beverage Regulatory Administration, and the police and fire departments).

extends to control of growing weeds. Thus, we cannot say that the 2002 Mayor's order creates an enforcement regime, as under the Housing Code,[46] that clothes vacant lot inspectors with discretion to cite lot owners with either a Notice of Violation (abatement) or a Notice of Infraction (non-abatement) for overgrown weeds, as appropriate under the circumstances.

**B.**

We therefore consider, finally, whether DPW (1) could lawfully cite Mazanderan under § 1002.1—as it did—for uncut weeds that were overgrown, not literally "thrown" or "deposited" on the lot, or (2) was limited to citing him for uncut, overgrown weeds under § 8-301, thereby granting him an abatement period

---

[46] The Housing Code expressly grants inspectors the discretion to decide whether or not to allow violators an opportunity to abate. *See* 14 DCMR § 800.15 (2011) (giving code enforcement official discretion to decide whether to issue a "notice of infraction," without time to abate, or a "notice of violation," with an abatement period before imposition of fine) and § 800.19 (2011) (specifying that "notice of violation" gives violators seven days within which to abate). Published decisions from OAH suggest that housing inspectors generally issue notices of violation for overgrown weeds on residential properties and issue a notice of infraction only when the owner does not abate. *See, e.g.*, *District of Columbia Dep't of Consumer & Regulatory Affairs v. Fuentes*, Nos. CR-I-09-Q105217, CR-C-09-100303, 2010 WL 6269127 (Office of Administrative Hearings, August 9, 2010) (dismissing notice of infraction issued upon re-inspection that occurred before end of abatement period specified in initial notice of violation); *District of Columbia Dep't of Consumer & Regulatory Affairs v. Stuart*, No. CR-I-05-Q101026, 2006 WL 927346 (Office of Administrative Hearings, February 23, 2006) (affirming fine for overgrown weeds on residential property where owner did not abate in response to initial notice of violation).

within which to cure the violation. This question has confounded many administrative law judges. The judge in this case agreed with DPW's interpretation of § 1002.1, but other OAH judges have rejected it.[47] Uncertainty about the scope of the regulation is easy to understand. Its plain terms—its activating verbs—prohibit "throw[ing]" or "deposit[ing]" specified things on vacant lots. Section 1002.2, which is formally included within § 1002.1,[48] also prohibits a forbidden "deposit . . . to remain on a vacant lot"; but again, considered literally, a deposit is plainly something that has been placed on the lot, not something that, like uncut, overgrown weeds, arrives by a natural process.

---

[47] *See, e.g.*, *Washington v. District of Columbia Dep't of Public Works*, 954 A.2d at 946 (noting that administrative law judge who issued order under review concluded that overgrown grass alone did not violate § 1002.1); *District of Columbia Dep't of Public Works v. Masjid al Islam & Masjid al Islam, Inc*., No. PW-V-06-K118184, 2007 WL 6861223 (Office of Administrative Hearings, December 26, 2007) (concluding that § 1002.1 does not prohibit overgrown, uncut weeds); *District of Columbia Dep't of Public Works v. Brixton, LLC*, No. PW-V-05-K105867, 2005 WL 4643381 (Office of Administrative Hearings, August 10, 2005) (same); *District of Columbia Dep't of Public Works v. Reatig*, Nos. PW-V-04-13594, PW-V-04-13595, 2005 WL 3935837 (Office of Administrative Hearings, January 14, 2005) (same). Because OAH judges decide appeals from many different agencies, we have held that they lack the specialized subject matter expertise that would warrant deference to their constructions of the statute. *Washington*, 954 A.2d at 948.

[48] See *supra* note 7.

Another provision, 24 DCMR § 1002.4 (1989),[49] makes a noteworthy exception to § 1002.1 to permit a "public dump"—an exception arguably reinforcing the implication that the Council limited § 1002.1 to a prohibition of "dumping" on vacant lots. Furthermore, § 1002.1 is codified in Chapter 10 ("Deposits on Public Space") of Title 24 of the DCMR, which deals generally with unlawful deposits on land. Section 1002.1, in sum, seems to tell property owners not to allow their vacant lots to become dumps. The initial, plain language of the regulation thus suggests that it does not prohibit uncut, overgrown weeds, only deposits of weeds.

But then came the 1989 amendment when the Council added "weeds" to the list of prohibited deposits, and explicitly defined "weeds" as "uncultivated or wild vegetation greater than four inches in height."[50] DPW therefore argues, first, that this amendment deems "deposits" to include growing weeds, even though—unlike every other item listed as a prohibited deposit—overgrown weeds are neither thrown nor deposited as those words are commonly understood. DPW insists that the Council would not have amended § 1002.1 in 1989 because of a perceived

---

[49] 24 DCMR § 1002.4 provides: "This section shall not apply to deposits of substances not injurious to health on any place designated by the Mayor as a public dump, where permission to make deposits is granted by the Mayor."

[50] See *supra* notes 6−10 and accompanying text.

problem with deposits of cut weeds on vacant lots; indeed, even before the 1989 amendment, § 1002.1 (a) forbade thrown or deposited "vegetable matter," a term broad enough to embrace cut weeds. DPW concludes, therefore, that the 1989 amendment necessarily invites the inference that the Council intended to prohibit overgrown weeds on vacant lots, as the amendment itself expressly provides through the language of amended 21 DCMR § 799.1.[51]

Second, DPW argues that the legislative history of the 1989 Act[52] makes clear that the Council intended the amended regulation to prohibit overgrown weeds. "Executive Branch Testimony" before the Council's Committee on Public Works on the 1989 Solid Waste Regulations Amendment Act[53] was provided by Anne Hoey, Administrator of DPW's Public Space Maintenance Administration, on November 7, 1988. She did not discuss weeds in her testimony but attached a chart, summarizing each provision of Bill 7-557, which eventually became the 1989 Act by way of Bill 8-135.[54] In that chart was the following description of the

---

[51] See text accompanying *supra* note 10.

[52] See *supra* notes 6−10 and accompanying text.

[53] See *supra* note 9.

[54] *See* Council of the District of Columbia, Report on Bill 8-135 at 51 (April 26, 1989), *available at* http://dclims1.dccouncil.us/lims/search.aspx (search for "Solid Waste Regulations Amendment Act of 1989").

amendment to the 1989 Act that became 21 DCMR § 799.1, as incorporated into § 1002.1: "Clarifies for the public what the District defines as weeds. Tickets may be issued for nuisances resulting from overgrown vacant lots." According to DPW, this testimony suggests that the Council, by enacting the 1989 amendments, incorporated DPW's recommendation that it receive authority to issue fines under § 1002.1 for overgrown weeds on vacant lots—in other words, that for regulatory purposes overgrown weeds would be considered "thrown" or "deposited" under § 1002.1.

Finally, contends DPW, before § 1002.1 was amended in 1989, only DCRA had authority to control uncut, growing weeds on vacant lots via § 8-301, despite the fact that DPW had practical authority at the time over all other prohibitions applicable to vacant lots. Therefore, notes DPW, by adding language to a regulation (§ 1002.1) that DPW was already charged with enforcing, the Council simplified the control of overgrown weeds on vacant lots by putting that control into the hands of the only agency that was responsible for policing those lots. The Council thereby enacted a coherent policy to give DPW authority over all the weeds—as well as all other litter—on vacant lots, rather than leave control of the growing weeds exclusively to another agency (DCRA) that otherwise had no vacant lot activity.

In making the foregoing arguments—which do have force—DPW does not come to grips with the fact that, if these arguments were to prevail, the Council in 1989, as a practical matter, would have converted regulation of growing weeds on vacant lots from a traditional abatement violation into a non-abatement violation (absent DCRA exercise of § 8-301 authority). We conclude, however, that the Council did not do so. In light of the history of weed control through parallel legislation in the District of Columbia, we must agree with Mazanderan that the Council has not successfully amended the "throw" or "deposit" regulation, § 1002.1, to prohibit uncut, overgrown weeds on vacant lots, subjecting the owner to a non-abatement Notice of Infraction.[55]

---

[55] Perhaps we could decide this case by merely assuming, for sake of argument, that DPW's interpretation of § 1002.1, as applied to growing weeds, is correct. We could then reverse on the ground that the inspector failed to recognize, and thus did not exercise, his discretion under the 2002 Mayor's order to cite Mazanderan for either an abatement (§ 8-301) or a non-abatement (§ 1002.1) violation. The typical remedy, however, would be to remand for an exercise of discretion—hardly a feasible remedy now—and thus in lieu thereof we perhaps could reverse the judge's ruling outright. But that approach will not do. The interpretation of § 1002.1 is at issue before us, and it would be inappropriate, we believe, to use a Mayor's omnibus enforcement order to moot the interpretation of Council legislation that preceded that order, thereby leaving in place, without resolution, DPW's understanding that § 1002.1 authorizes a non-abatement "Notice of Infraction" for overgrown, uncut weeds. We must resolve that interpretive issue.

*First*, as elaborated earlier, if we were to accept DPW's interpretation of § 1002.1, we would have to redefine, well beyond their natural meanings, the words "throw" and "deposit" that describe and drive the prohibition of weeds on vacant lots. A regulation that states an unambiguous, active violation ("thrown or deposited" debris), and then is amended by a provision facially at odds with a "throw" or "deposit" ("uncultivated or wild vegetation"),[56] creates a linguistic disconnect that leaves unclear (beyond mere inference) how a lot owner will know when he has "thrown or deposited" growing weeds, whatever their length.

*Second*, our reliance on this linguistic disconnect to doubt the application of § 1002.1 to overgrown weeds is substantially reinforced by the Council's failure to give any indication that, in amending that regulation, it intended to repeal the historic abatement right that the District has traditionally provided for overgrown weeds on vacant lots.[57] More specifically, in 1989, when the Council amended

---

[56] See text following *supra* note 10 (characterizing "weeds" that are "greater than four inches in height").

[57] See *supra* part III.A. (discussing D.C. Code § 8-301). Other provisions of the D.C. Code also treat overgrown grasses and weeds exclusively as an abatement infraction. *See* D.C. Code § 8-2103.05 (2012 Repl.) (prohibiting grasses and weeds over eight inches in height as a rodent control measure, giving violators fourteen days to abate, and bringing the provision under the 1985 Civil Infractions Act). Furthermore, in general, the District must give property owners notice of any nuisance conditions on their property and an opportunity to abate unless the

(continued . . .)

§ 1002.1 to reference growing weeds,[58] there was nothing to suggest that the Council was aware that overgrown weeds on vacant lots were already prohibited by § 8-301 and intended to replace § 8-301 with a non-abatement penalty. Absent an express repeal of § 8-301, moreover, we cannot find even an implied repeal. The words of § 1002.1 and § 8-301 are not "so irreconcilable . . . that the two cannot have concurrent operation."[59] We can harmonize the two provisions by reading § 1002.1 to prohibit only "deposits" of cut weeds and other debris while § 8-301 requires removal of growing weeds of prohibited height.

*Third*, it cannot be said that in 1989, by adding a reference to growing weeds in § 1002.1, the Council created a non-abatement alternative to § 8-301. There is no basis for inferring that the Council intended such a result, especially because that non-abatement alternative would have left on the books two conflicting provisions addressed to growing weeds, derived from different legislation, and

---

(. . . continued)

conditions "constitute a life-or-health threatening condition." D.C. Code § 42-3131 (c) (1) (2012 Repl.).

[58] See text accompanying *supra* notes 9 and 10.

[59] *See United States Parole Comm'n v. Noble*, 693 A.2d at 108 (quoting *Speyer v. Barry*, 588 A.2d 1147, 1165 (D.C. 1991)).

administrable at the time by two different agencies, DCRA (§ 8-301) and DPW (§ 1002.1). Not even DPW takes this fallback position.

*Finally*, although the 2002 Mayor's order gave DPW authority to enforce both § 8-301 and § 1002.1 on vacant lots, that order, as we have noted, supplies no guidance to inspectors for determining which regulation to enforce in any particular situation. Nor does it give lot owners adequate notice of the legal exposure to which their particular lots will be subject. That order merely left interpretation of § 1002.1 to DPW—an interpretation we reject for the reasons given. We conclude, accordingly, that a failure to trim uncut, overgrown weeds on a vacant lot does not violate § 1002.1;[60] it is exclusively a § 8-301 violation.[61] Under present law, therefore, DPW has authority under § 8-301 to issue a Notice

---

[60] Section 1002.1 includes § 1002.2. See *supra* note 7 and accompanying text.

[61] In concluding that Mazanderan has a right to notice and an opportunity to abate before he is fined for the overgrown weeds on his vacant lot, we emphasize that this right is strictly statutory. A civil enforcement scheme that allows the District to fine violators with an initial notice of violation could fully comport with constitutional due process. *See Bruno v. District of Columbia Bd. of Appeals and Review*, 665 A.2d 202, 204 (D.C. 1995) ("A system of relatively modest fines . . . imposed for violations of the statute without affording the violator an opportunity to abate reasonably furthers the objective of an anti-litter law."). While regulatory schemes have been struck down on due process grounds, the person attacking the scheme has the heavy burden of showing that the scheme is unreasonable and not rationally related to legitimate government objectives. *Id.*

of Violation for growing weeds, permitting an abatement period before a fine, and authority under § 1002.1 to issue a Notice of Infraction for a deposit of cut weeds and other debris, without right of abatement. Additional legislation will therefore be required before a Notice of Infraction can be issued for uncut, overgrown weeds on vacant lots.

## V.

Even if § 1002.1 does not prohibit overgrown weeds, DPW argues that we can affirm OAH's decision simply on the basis of evidence of litter and other debris on Mazanderan's lot. The record, however, contains scant evidence for the judge's conclusion that the lot was "littered with solid waste," as that phrase is defined in 21 DCMR § 799.1.[62] The original Notice of Violation instructed Mazanderan to clean the vacant lot and cut all weeds and properly dispose of them. It did not mention any debris or litter on the lot. Although photographs in evidence show two light-colored items on the lot, the record contains no further descriptions of these items that would clearly permit a finding that they are "solid waste" or any other type of refuse prohibited under § 1002.1. Because the judge did not expressly find that the litter on Mazanderan's lot was sufficient to constitute a

---

[62] See *supra* note 6 and text accompanying note 10.

violation, we must remand the case to OAH to permit the judge to address that factual issue.

Finally, because Mazanderan did not appear at the hearing, the judge fined him an additional $300.[63] But supplementary fines for late response to a Notice of Violation may be imposed only on those who have violated a substantive provision of the law.[64] We therefore vacate the additional $300 fine, subject to reconsideration in light of the proceedings on remand.

*****

We reverse the OAH ruling that Mazanderan violated 24 DCMR §§ 1-1002.1-.2; vacate the $300 fine imposed for failure to appear at the November 14, 2012, hearing; and remand to OAH for further proceedings consistent with this opinion.

*So ordered.*

---

[63] *See* D.C. Code § 8-805 (e) (2012 Repl.).

[64] *See Washington v. District of Columbia Dep't of Public Works*, 954 A.2d 945, 949 (D.C. 2008).