*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 17-CO-1443

EUGENE HICKERSON, APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(1976-FEL-096839)

(Hon. Thomas J. Motley and Hon. Maribeth Raffinan, Trial Judges)

(Argued February 25, 2021                    Decided January 5, 2023)

*Patricia Cresta-Savage* for appellant.

*Ethan L. Carroll*, Assistant United States Attorney, with whom *Timothy J. Shea*, Acting United States Attorney at the time of filing, and *Elizabeth Trosman*, *John P. Mannarino*, and *Daniel Friedman*, Assistant United States Attorneys, were on the brief, for appellee.

Before EASTERLY and DEAHL, *Associate Judges*, and WASHINGTON, *Senior Judge*.

Opinion of the court by *Associate Judge* DEAHL.

Concurring opinion by *Associate Judge* EASTERLY at page 29.

DEAHL, *Associate Judge*:  This appeal concerns an ex post facto challenge to sex offender registration requirements.  Eugene Hickerson pled guilty to one count of sodomy, a sex offense, in 1977.  He was eighteen years old at the time, and he perpetrated his offense against a ten-year-old child.  The record does not indicate precisely how long Hickerson was imprisoned or how long any term of parole was, but it is clear that by 1983 he had been released without conditions.  More than three decades later, in 2016, Hickerson was for the first time ordered to register as a sex offender under the District of Columbia's Sex Offender Registration Act of 1999 (SORA), D.C. Code §§ 22-4001 to -4017.

Hickerson was required to register at that point because he pled guilty to a misdemeanor count of simple possession of heroin.  He received a probationary sentence that brought him within one of SORA's definitions of a "[s]ex offender," which includes one who "[c]ommitted a registration offense *at any time* and is in custody or under supervision on or after July 11, 2000" (the date SORA went into effect).  D.C. Code § 22-4001(9)(B) (emphasis added).  Based on the date of his sex offense, Hickerson would not have had to register if he had avoided custody and supervision after SORA's enactment in 2000.  But once he came under supervision in 2016—albeit for a non-sex offense—that triggered the requirement that he register

for his decades-old sex offense. Hickerson challenged the order directing him to register as a sex offender in the Superior Court, which rejected his challenge.

Hickerson now appeals. He makes two arguments challenging the Superior Court's determination that he must register as a sex offender. First, he contends that his 1977 conviction is not a "registration offense" under SORA because it was set aside under the Federal Youth Corrections Act (FYCA), 18 U.S.C. §§ 5005-5026 (1976) (repealed 1984). Second, he argues that SORA registration is an unconstitutional ex post facto punishment when applied to registrants who, like Hickerson, had completed their sentences and any probationary terms attendant to their sex offenses prior to SORA's enactment. We disagree with him on both points and affirm.

## I.

In 1977, when he was eighteen years old, Hickerson pled guilty to one count of sodomy. Most of the records relating to that conviction have been lost, though the government asserts (and Hickerson does not deny) that the victim was a ten-year-

old boy.[1] Following his guilty plea, Hickerson was sentenced to an indeterminate period of imprisonment under the FYCA. The record does not indicate precisely how long Hickerson was imprisoned, but those sentenced under the FYCA had to "be discharged unconditionally on or before six years from the date of [] conviction." 18 U.S.C. § 5017(c) (1976). Hickerson maintains that he was in fact incarcerated for just one year, after which he spent several months in a halfway house and was then released from custody. At the time of his unconditional release, the District did not impose any registration requirements on people who had been convicted of sex offenses.

In 2000, the District enacted SORA.[2] SORA requires the District to maintain a registry of sex offenders who "live, reside, work or attend school in the District of Columbia." *In re W.M.*, 851 A.2d 431, 436 (D.C. 2004). To accomplish this, SORA imposes a battery of reporting requirements on sex offenders, including providing the Court Services and Offender Supervision Agency, or CSOSA, with a current

---

[1] The government has produced a copy of the police report and grand jury indictment. But "[d]ue to the age of this case, the government" represents that it "has been unable to locate its trial file or obtain any transcripts from the hearings."

[2] The Sex Offender Registration Act of 1999 replaced the Sex Offender Registration Act of 1996, D.C. Law 11-274 (1997), codified as D.C. Code §§ 22-4101 to 4117 (repealed 2000). *See Cannon v. Igborzurkie*, 779 A.2d 887, 888 n.1 (D.C. 2001).

photograph, various identifying characteristics, and any current or expected residential, work, or school addresses within the District. *Id.* (citing D.C. Code § 22-4007(a)(2)). Registrants are required to periodically update and verify all of the above information. *See* D.C. Code § 22-4008(a)(1); 28 CFR § 811.9(d) (requiring in-person verification). In addition, SORA empowers the Metropolitan Police Department to make registry information available to the public,[3] and—for some classes of offenders, including Hickerson—to actively notify members of the community about their status and information. *See In re W.M.*, A.2d at 437-38.

SORA defines a "sex offender" as anyone who:

> (A) Committed a registration offense on or after July 11, 2000;
>
> (B) Committed a registration offense at any time and is in custody or under supervision on or after July 11, 2000;
>
> (C) Was required to register under the law of the District of Columbia on the day before July 11, 2000; or
>
> (D) Committed a registration offense at any time in another jurisdiction and, within the registration period, enters the District of Columbia to live, reside, work or attend school.

---

[3] This passive notification is accomplished in part via a police department website. *See* District of Columbia Sex Offender Registry, available at https://mpdc.dc.gov/service/sex-offender-registry; https://perma.cc/9B53-XXQJ

D.C. Code § 22-4001(9). The parties agree that Hickerson's sodomy conviction qualifies as a registration offense. The parties also agree that Hickerson was not required to register as a sex offender at the time SORA was enacted because his qualifying conviction predated July 11, 2000, *id.* § 22-4001(9)(A); he was not "in custody or under supervision" at the time SORA was enacted, *id.* § 22-4001(9)(B); he was not required, under the terms of the 1996 iteration of SORA, to register the day before SORA passed, *id.* § 22-4001(9)(C); and he did not commit his registration offense in another jurisdiction, *id.* § 22-4001(9)(D).

But then, in 2016, Hickerson pled guilty to misdemeanor possession of heroin. He received a suspended sentence of thirty days' incarceration and one year of probation.[4] Several weeks later, CSOSA notified Hickerson that, because he was now "under supervision" for his misdemeanor drug possession conviction, SORA required him to register as a sex offender, based on his 1977 sodomy conviction, for the remainder of his life. *See* D.C. Code § 22-4001(9)(B); *see also id.* § 22-4001(6)(B) (listing as a lifetime registration offense "sodomy as this offense

---

[4] The government notes that Hickerson has two other misdemeanor convictions that post-dated SORA's enactment: a conviction for attempted threats and one for a Bail Reform Act violation. It is not clear why neither triggered a registration requirement—perhaps because neither conviction resulted in custody or supervision. In any event, the parties do not attribute any significance to those convictions, and neither do we.

was proscribed until May 23, 1995 by § 22-3802(a)"). Hickerson filed a motion for judicial review of CSOSA's determination, arguing that his 1977 conviction was not a registration offense under SORA because it had been set aside under the FYCA, and raising an ex post facto challenge to the registration order. The trial court denied Hickerson's motion. Hickerson now appeals.

## II.

Hickerson makes two arguments on appeal. First, he argues that his sodomy conviction was set aside under the FYCA and so cannot serve as a registration offense under SORA. *See* D.C. Code § 22-4001(3) ("A person is not deemed to have committed a registration offense" if the relevant conviction "has been reversed or vacated, or if the person has been pardoned for the offense on the ground of innocence."). Second, he argues that it is a violation of the Constitution's prohibition on ex post facto punishment to apply SORA's registration requirements to those who, like himself, had completed their sentences for sex offenses prior to SORA's enactment. We consider those arguments in turn.

**A.**

We begin with Hickerson's statutory argument: that his 1977 conviction cannot serve as a registration offense under SORA because it was set aside under the FYCA. Because it is not entirely clear whether Hickerson's sodomy conviction was in fact set aside, the parties grapple in their briefs about who bore the burden of proof on that factual question. The trial court reasoned that it was Hickerson's burden to prove his conviction was set aside, as the government now maintains. But Hickerson makes a powerful argument that the government should bear the burden because it has superior access to the pertinent records that could demonstrate whether or not his conviction was set aside. We do not resolve this dispute, because even if we assume Hickerson's sodomy conviction was set aside under the FYCA, it remains a registrable offense under SORA.

Hickerson's contrary argument relies on D.C. Code § 22-4001(3), which states that "[a] person is not deemed to have committed a registration offense . . . if the disposition . . . has been reversed or vacated, or if the person has been pardoned for the offense on the ground of innocence." In Hickerson's view, that provision relieves him of the obligation to register under SORA because a conviction that is set aside is akin to one that has been reversed or vacated. We disagree.

Section 22-4001(3) enumerates only three exceptions to SORA's definition of a registration offense: convictions that are (1) reversed, (2) vacated, or (3) pardoned on the ground of innocence. That list does not include convictions that are set aside or expunged, and we will not read additional exceptions into statutory language that does not encompass them. "When [a legislature] provides exceptions in a statute, it does not follow that courts have authority to create others. The proper inference . . . is that [the legislature] considered the issue of exceptions and, in the end, limited the statute to the ones set forth." *Facebook, Inc. v. Wint*, 199 A.3d 625, 632 (D.C. 2019) (quoting *United States v. Johnson*, 529 U.S. 53, 58 (2000)). Moreover, the Council's choice to limit the excluded categories to convictions that are reversed, vacated, or pardoned *on the ground of innocence* suggests an intention to exclude from SORA's ambit only convictions that were ill-gotten, and not those that were simply removed from one's record for independent policy reasons. *See Doe v. Webster*, 606 F.2d 1226, 1234 (D.C. Cir. 1979) (explaining that the FYCA's set-aside provision was "intended to give youthful ex-offenders a fresh start, free from the stain of a criminal conviction").

The legislative history bolsters that conclusion. *See Clement v. D.C. Dep't of Emp. Servs.*, 126 A.3d 1137, 1139-40 (D.C. 2015) ("[E]ven where statutory language has a superficial clarity, a detailed consideration of other factors, such as

the specific context in which that language is used and the broader context of the statute as a whole, when viewed in light of the statute's legislative history, may reveal ambiguities that this court must resolve." (quoting *Mazanderan v. D.C. Dep't of Pub. Works*, 94 A.3d 770, 774 (D.C. 2014))). The same year the Council enacted SORA, it also enacted the Sentencing Reform Amendment Act of 2000, which explicitly stated that convictions set aside under the FYCA's successor statute "may be used" for purposes of determining sex offender status.[5]  *See* D.C. Code § 24-906(f)(6). The committee report to that bill explained that "a sex offender must register except if his or her conviction is 'reversed or vacated,' or if he or she is 'pardoned for the offense on the grounds of innocence.' A set aside falls into none of these categories." Comm. on the Judiciary Rep., Bill 13-696, at 26 (May 25, 2000). That is strong evidence that the very same legislature that passed SORA intended registration offenses to remain as such regardless of whether they were set aside.

Hickerson counters that we should read § 22-4001(3) as excluding his offense from the category of registration offense because a set-aside under the FYCA is the "functional equivalent" of a vacated conviction. We disagree with that

---

[5] *See* D.C. Law 13-302, 47 D.C. Reg. 7249 (Aug. 2, 2000).

characterization, and in any event we are not free to read functional equivalents into statutory language that excludes them, particularly where the legislative history demonstrates their exclusion was intentional. As a descriptive matter, an FYCA set-aside is not the equivalent of a reversed or vacated conviction. It is more like an expungement,[6] which casts no doubt on the integrity of the conviction itself, but denotes a policy judgment to remove the conviction from a person's public record. *See Lindsay v. United States*, 520 A.2d 1059, 1063 (D.C. 1987) (a set-aside has the "effect [of] *expunging* the conviction from records available to the public, as well as removing legal disabilities created by the conviction" (emphasis added)); *see also United States v. Law*, 528 F.3d 888, 910 (D.C. Cir. 2008) (analyzing "[t]he term 'set aside' and the related term 'expunge'"); *Tuten v. United States*, 460 U.S. 660, 665 (1983) (comparing set-aside to other "expungement statutes").

A set-aside, unlike the reversal or vacatur of a conviction, "does not alter the fact of conviction." *Lindsay*, 520 A.2d at 1063; *see also Solomon v. United States*, 120 A.3d 618, 621 (D.C. 2015) ("The [] set-aside did not in any sense 'forgive' [the defendant's] past conduct. It was not a pardon."). To illustrate, even with an FYCA set-aside, the conviction records remain available to "law enforcement personnel and

---

[6] An expungement is "[t]he removal of a conviction . . . from a person's criminal record." *Expungement of Record*, Black's Law Dictionary (11th ed. 2019).

court officials" and in "situations where access . . . might be legitimate and important in the interests of justice." *Lindsay*, 520 A.2d at 1063. Also, a conviction that was set aside under the FYCA may be considered by a judge during sentencing for a subsequent offense. *Barnes v. United States*, 529 A.2d 284, 288-89 (D.C. 1987); *cf. Wade v. United States*, 173 A.3d 87, 95 (D.C. 2017) (Youth Rehabilitation Act is likewise "properly understood to authorize the use of set-aside convictions in determining the appropriate sentence to be imposed in the event a defendant is subsequently found guilty of an additional crime").

Hickerson further argues that treating an FYCA set-aside as the equivalent of a vacated conviction is consistent with the purpose of the FYCA, which was "to give youthful ex-offenders a fresh start, free from the stain of a criminal conviction." *Webster*, 606 F.2d at 1234. Perhaps so, but such an inference would be inconsistent with the plain text of SORA, and the legislature that passed the latter statute was free to revisit, revise, and limit the degree to which an FYCA set-aside would in fact provide sex offenders with a clean slate.

In sum, because set-aside sex-offense convictions remain within SORA's definition of a registration offense, SORA required Hickerson to register as a sex

offender following his 2016 conviction, even assuming his earlier conviction was set aside.

## B.

We now turn to the question of whether the statute as applied to Hickerson violates the constitutional prohibition on ex post facto punishments. This is not the first time we have considered whether SORA's registration and notification provisions amount to unconstitutional ex post facto punishment. Because we believe that *In re W.M.* directs the outcome here, we first summarize its analysis, and then apply it to Hickerson's case.

## 1.

"Retroactive application of a law that inflicts greater punishment than did the law that was in effect when the crime was committed is forbidden by the Ex Post Facto Clauses of the Constitution." *In re W.M.*, 851 A.2d at 440 (citing U.S. Const. art. I, § 9, cl. 3; art. I, § 10, cl. 1). A threshold issue when evaluating an ex post facto

challenge is whether the sanction complained of constitutes punishment at all.[7] That question is governed by a two-step inquiry set forth in *Smith v. Doe*, 538 U.S. 84, 92 (2003). First, we must ascertain whether the legislature's intent in imposing the restriction was "to enact a regulatory scheme that is civil and nonpunitive," or if instead it intended to "impose punishment." *Id.* "If the intention of the legislature was to impose punishment, that ends the inquiry": the sanction is a punishment. *Id.* "If, however, the [legislature's] intention was to enact a regulatory scheme that is civil and nonpunitive, we must further examine whether the statutory scheme is so punitive either in purpose or effect as to negate the [legislature's] intention to deem it civil." *Id.* (quotation omitted). "Because we ordinarily defer to the legislature's stated intent, only the clearest proof will suffice to override legislative intent and

---

[7] Whether something is a "punishment" for purposes of the Ex Post Facto Clauses is quite distinct from whether it is "penalty" for purposes of the Sixth Amendment's right to a jury trial. *See Bado v. United States*, 186 A.3d 1243, 1259-60 (D.C. 2018) (en banc); *Padilla v. Kentucky*, 559 U.S. 356, 365-66 (2010). Both the Supreme Court in *Padilla v. Kentucky* and this court in *Bado v. United States* recognized that there are penalties that trigger the Sixth Amendment's right to a jury trial but are not punishments under the Ex Post Facto Clauses. *See Padilla*, 559 U.S. at 365-66; *Bado*, 186 A.3d at 1259-60. There are currently other cases pending before this court raising the question of whether sex offender registration is a penalty such that one who faces it is entitled to a trial by jury. *See Crane v. United States*, No. 19-CM-26 (argued Sept. 22, 2020); *Fallen v. United States*, No. 19-CM-233 (argued Nov. 20, 2020). Our discussion of whether sex offender registration is a punishment under the Ex Post Facto Clauses sheds little light on that distinct Sixth Amendment question.

transform what has been denominated a civil remedy into a criminal penalty." *Id.* (quotations omitted).

In *Smith*, the Supreme Court applied that test to Alaska's Sex Offender Registration Act. It concluded that sex offender registration was "a civil regulatory scheme" and not an ex post facto punishment, even when applied to those who had both committed their offenses and completed their terms of imprisonment before the Act's passage. *Smith*, 538 U.S. at 91, 105-06.

In *In re W.M.*, we applied *Smith* to the District's SORA and reached the same conclusion. 851 A.2d at 446. We first found that the Council intended SORA not as punishment, but as a "regulatory measure[] adopted for public safety purposes." *Id.* at 441. We then determined that SORA's registration and notification provisions were not so punitive in purpose or effect as to provide the "clearest proof" necessary to override that intent. *Id.* at 443.

To structure that second inquiry, we followed the Court's example in *Smith* and focused on the following five factors:

> (1) whether the sanction involves an affirmative disability or restraint; (2) whether it has historically been regarded as a punishment; . . . [3] whether its operation will promote the traditional aims of punishment—retribution and deterrence; . . . [4]

whether an alternative purpose to which it may rationally be connected is assignable for it; and [5] whether it appears excessive in relation to the alternative purpose assigned.

*In re W.M.,* at 443 n.12 (listing the factors set out in *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69 (1963)).[8] Quoting largely from *Smith*, we first determined that SORA does not involve a "significant affirmative disability or restraint" because it "imposes no physical restraint, nor does it restrain activities sex offenders may pursue," and because any "lasting and painful impact on the convicted sex offender" is a consequence that flows "not from the Act's registration and dissemination provisions, but from the fact of conviction, already a matter of public record." *Id.* at 444 & n.15 (quotation marks omitted). Second, we determined that "registration and public notification have not been regarded historically or traditionally as punishment" and "in particular any analogy to early colonial shaming punishments . . . would be misleading, for the purpose and the principal effect of notification are to inform the public for its own safety, not to humiliate the offender." *Id.* at 444 (quotation marks omitted). Third, we ascribed little weight to the fact that SORA

---

[8] As did the Court in *Smith*, 538 U.S. at 105, we concluded that the remaining *Mendoza-Martinez* guideposts—"whether [the law] comes into play only on a finding of *scienter*" and "whether the behavior to which it applies is already a crime"—are "of little weight" when evaluating SORA. *In re W.M.*, 851 A.2d at 444 n.13. We likewise bypass those extraneous factors in our consideration today.

promotes "one of the traditional aims of punishment," deterrence, because "any number of governmental programs might deter crime without imposing punishment." *Id.* at 445. Instead, we emphasized the fourth factor, stating that "[i]t is more important that the scheme undeniably has a rational connection to a legitimate, non-punitive purpose of public safety, by alerting the public to the risk of sex offenders in their community." *Id.* at 445 (quotation marks omitted).

Turning to the fifth and final factor, we considered two separate grounds on which SORA might be deemed "excessive in relation to its valid purpose." *Id.* First, we considered whether SORA is excessive because its registration requirements "apply to all sex offenders without regard to their future dangerousness." *See id*. We determined that SORA is not excessive on that ground because:

> [T]he excessiveness inquiry . . . is not an exercise in determining whether the legislature has made the best choice possible to address the problem it seeks to remedy. The question is whether the regulatory means chosen are reasonable in light of the nonpunitive objective. Thus, a state reasonably could conclude that a conviction for a sex offense provides evidence of substantial risk of recidivism that is sufficient without more to justify a regulatory response.

*Id.* (internal citations and quotation marks omitted). Second, we considered whether SORA is excessive because its notification provisions "place[] no limits on the number of persons who have access to the information disseminated to the public

about offenders." *Id.* We determined that SORA is not excessive on that ground for three reasons: (1) "[a]n individual [member of the public] must seek access to the information"; (2) the registry "warns visitors against using the information [contained] to commit criminal acts"; and (3) maintenance of an internet database is reasonable "given the general mobility of our population." *Id.* at 446.

Accordingly, we held in *In re W.M.* that—notwithstanding "cogen[t]" objections to SORA's effects on "former offenders who have rehabilitated themselves"—SORA was not sufficiently punitive in purpose or effect to override the legislature's intent to enact a regulatory scheme. *Id.* at 443. Therefore, we concluded that SORA did not impose unconstitutional ex post facto punishment, at least as to the appellants then before us.[9] *Id.*

---

[9] The appellants in *In re W.M.* challenged SORA's "application to those persons who, like themselves, committed sex offenses before its enactment or were acquitted of sex offenses by reason of insanity." 851 A.2d at 431 (emphasis added). That category subsumes Hickerson, and others like him, who have the additional feature of having completed their sentences and any term of supervision prior to SORA's enactment.

**2.**

On appeal, Hickerson argues that SORA is unconstitutional as applied to individuals who (1) "live or work or attend school in the District of Columbia," and (2) "committed their offense and completed all custody or official supervision at some time" before the enactment of SORA.[10] At the outset, it is questionable whether any as-applied ex post facto challenge to SORA could succeed in this jurisdiction after *In re W.M.* The Supreme Court in *Seling v. Young* suggested not. 531 U.S. 250, 263-64 (2001) ("Permitting respondent's as-applied challenge would invite an end run around the Washington Supreme Court's decision that the Act is civil in circumstances where a direct attack on that decision is not before this Court."). As we have described *Seling*'s holding, the Supreme Court "rejected the argument that a statute can be declared punitive 'as applied' to a particular person when the highest State court has already definitively construed the statute as civil," which is "precisely the case here." *Arthur v. United States*, 253 A.3d 134, 141 (D.C. 2021) (citation omitted). Yet in *Arthur*, based on a government concession, we entertained the possibility "that even after a decision by the highest court of a

---

[10] To the extent Hickerson asks us to reverse *In re W.M.*, this panel lacks that authority. *See M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C. 1971) ("[N]o division of this court will overrule a prior decision of this court.").

jurisdiction that a statute is civil, an as-applied ex post facto challenge might lie if the punitive effects are alleged to burden a broad class of sex-offenders." *Id.*

Because the parties have not briefed or discussed this point—*Arthur* was decided after the argument in this case—we will entertain the same possibility, without expressing an opinion on the point. Assuming that *In re W.M.* does not foreclose all as-applied ex-post facto challenges to SORA, but may permit one brought on a behalf of a sufficiently broad class of registrants, we nonetheless reject Hickerson's challenge for three reasons.[11]

---

[11] Our concurring colleague contends that Hickerson has not raised an ex post facto challenge on behalf of any group because his assertions that there are "countless" others, "many" others, and "thousands" others like him come only in the introductory portion of his brief's argument section. It is initially unclear that there is a meaningful difference between an as-applied ex post facto challenge and an as-applied "group-based" ex post facto challenge at all, a distinction that we first flirted with in *Arthur*, 253 A.3d at 144. If we were to attach importance to the distinction for the first time here, Hickerson's repeated references to the many others like him seem sufficient to preserve the point. The concurrence further contends that *Arthur* had faulted other courts for incorrectly interpreting *Seling* without taking this group-based distinction into account, so that we are now obliged to attach significance to it. We read *Arthur* differently. *Arthur* faulted other courts for concluding that ex post facto challenges could not be brought on an as-applied basis *at all*, whereas *Arthur* clarified that *Seling* only said that was the case "when the highest State court has already definitively construed the statute as civil," as we have already done with SORA in *In re W.M. Id.* at 141; *see also id.* at 144 n.23 (distinguishing an as-applied challenge to Michigan's SORA because the state's high court had never opined on whether the statute was civil in nature). But once the highest court of a jurisdiction has already definitively construed a statute as civil, we see *Arthur* as leaving the viability of group-based ex post facto challenge as an open question.

*a.* Smith *and* In re W.M. *rejected challenges by litigants in this same class.*

First, the Supreme Court confronted this exact scenario of a registrant who had completed the entirety of his sentence and parole prior to the enactment of a sex offender registration statute in *Smith*, and we confronted this same scenario as well in *In re W.M.*, yet both precedents concluded there was no ex post facto violation. In *Smith*, respondents John Doe I and John Doe II had been released from detention in 1990, four years before Alaska enacted its version of SORA. 538 U.S. at 90-91. John Doe II had "successfully completed mandatory parole and was unconditionally discharged in 1992," still two years prior to Alaska enacted its SORA. Brief for Respondents at 2, *Smith v. Doe*, 538 U.S. 84 (2003) (No. 01-729), 2002 WL 1885873, at *2. The Supreme Court attached no significance to John Doe II's completion of parole when it rejected his as-applied ex post facto challenge. *See Smith*, 538 U.S. at 91 ("[R]espondents . . . brought an action . . . seeking to declare the Act void *as to them* under the *Ex Post Facto* Clause of Article I, § 10, cl. 1, of the Constitution." (emphasis added)); *see also In re W.M.*, 851 A.2d at 434-35 (describing *Smith* as rejecting an "as applied" ex post facto challenge). Even the three dissenting Justices, who would have held registration constituted an ex post facto violation as applied to the John Doe respondents, attached no significance to the fact that John Doe II was not under supervision when Alaska passed its version

of SORA.  *See generally Smith*, 538 U.S. at 110-14 (Stevens, J., dissenting as to the ex post facto issue); *id.* at 114-18 (Ginsburg, J., dissenting).

Similarly, it appears that this court confronted Hickerson's precise situation in *In re W.M.* and found no ex post facto violation.  *In re W.M.* involved eight consolidated cases.  851 A.2d at 434, 439.  One of the appellants, K.M., "was convicted of rape in South Carolina in 1969[,] . . . paroled in 1984 after serving fifteen years in prison," and had "successfully completed parole" with "no subsequent convictions."  *Id.* at 439.  While neither our opinion nor the underlying briefing is crystal clear on the point, it is exceedingly likely that K.M. had completed his parole prior to SORA's enactment,[12] just like Hickerson, and yet we attached no significance to that fact in concluding that registration did not constitute ex post facto punishment.  In any event, even if we entertain the conceptual possibility that K.M.'s parole expired only after SORA's enactment, thereby differentiating him from Hickerson, what cannot be disputed is that we—like the Supreme Court in *Smith*—

---

[12] K.M. filed his challenge to SORA within months of its enactment.  He completed parole at some point before his challenge.  *See In re W.M.*, 851 A.2d at 429 ("K.M. successfully completed parole.").  The odds of his parole expiring in the small post-enactment, pre-challenge window is miniscule when compared with the odds of his parole having expired at some point during the sixteen years between when K.M. was placed on parole and before SORA's enactment.  It seems K.M. was required to register under § 22-4001(9)(D) because his was an out-of-state conviction.

attached no significance to when his parole expired. We noted only that K.M. had "successfully completed parole," *id.*, but the timing of his parole's termination was clearly of no moment as we did not see fit to specify when it had ended. The fact that neither *Smith* nor *In re W.M.* attached any significance to the fact that a registrant had been unconditionally released prior to the enactment of legislation requiring them to register as sex offenders compels us to follow suit.

*b. The burdens of registration do not fall more heavily on Hickerson's class.*

Second, we disagree with Hickerson's argument that he and others who had completed the terms of their sentences prior to SORA's enactment suffer harsher consequences than those who were still completing their sentences at SORA's enactment. Hickerson asks us to draw a distinction between (1) individuals who completed the sentence for their qualifying conviction prior to the enactment of SORA, and (2) individuals who were still under any modicum of supervision when SORA was enacted, even if their convictions occurred and their physical confinement ended decades earlier. In Hickerson's view, the same registration and notification provisions that constitute the "clearest proof" of punishment with regard to the first class are constitutional fair game as to the second. That distinction crumbles under scrutiny.

Consider an offender who (1) had committed precisely the same offense as Hickerson at precisely the same time in 1977, (2) had remained under some limited degree of supervision until a day after SORA's enactment, and (3) never committed another criminal offense thereafter. Hickerson's argument hinges on SORA being non-punitive as to that individual—a conclusion compelled by *In re W.M.*—but punitive as to the individual who had completed their supervision just before SORA's enactment and later reoffended. If anything, SORA seems less punitive as to the latter individual who, unlike the imagined counterpart, could have avoided registration entirely if only they had avoided reoffending. Viewed in that light, the Council's decision in § 22-4001(9)(B) to require registration only for individuals under supervision granted Hickerson a *reprieve* of sixteen years, as well as an opportunity to avoid registration indefinitely if he avoided any further convictions. It would be perverse to take that reprieve as evidence that his registration was more punitive than that of the offender who, through an accident of timing, spent a decade and a half longer registered as a sex offender, subject to precisely the same requirements Hickerson complains of now.

Hickerson offers little reason to think that the effects of registration are particularly severe as to those, like him, who had completed their sentences before

SORA's enactment.[13]   He instead describes in general terms the stigma of registration, as well as its potential impact on employment opportunities, housing prospects, and the rights to privacy and travel, which are not unique impediments to the class he identifies.  To touch on the *Mendoza-Martinez* factors discussed above: (1) Hickerson is no more restrained—physically or otherwise—than other registrants; (2) the restrictions on him are no more historically regarded as punishments; (3) they do not promote the aim of retribution any more when applied to him;[14] (4) there is a rational connection between an individual's history as a sex

---

[13] Many of the effects that Hickerson describes are not unique to this class at all.  For example, while Hickerson points to U.S. Department of Housing and Urban Development regulations that prevent sex-offenders from accessing public housing and legal requirements that prevent sex-offenders from easily traveling from state to state or to a foreign country, those hardships do not fall uniquely or even disparately on Hickerson or the class he identifies.  The same can be said regarding Hickerson's complaint that some registrants are required to periodically appear in person to verify their information.  Hickerson's argument that "SORA is a penal statute" because it is codified in Title 22 of the D.C. Code ("Criminal Offenses and Penalties") has no bearing on his class in particular, and in any event, we expressly gave SORA's placement in the criminal code no weight in *In re W.M.  See* 851 A.2d at 442 (noting that an "administrative decision on which the [D.C.] Council did not even vote says nothing about the intent of the legislature when it passed SORA").

[14] SORA arguably promotes the aim of deterrence when applied to Hickerson's class, as compared to the hypothetical counterpart who was still under government supervision when SORA was passed, because only those in his class could be deterred from reoffending by the threat of registration.  But an incidental deterrent effect alone cannot render a statute punitive, especially where every other factor weighs in favor of it not being considered punitive.  *See Smith*, 528 U.S. at 102 ("To hold that the mere presence of a deterrent purpose renders [] sanctions

offender and the regulatory purpose of informing the public about that aspect of the individual's history; and (5) the restriction is no more excessive than as applied to other registrants. We reached those same conclusions in *In re W.M.*, 851 A.2d at 444-46, and there is no persuasive reason to depart from them now.

We are sympathetic to Hickerson's contention that SORA is "unfair to former offenders who have rehabilitated themselves." *Id.* at 443. That said, we are equally sympathetic to the rehabilitated registrant who was still under some limited supervision with the expectation that, at the end of their term, they would be able to live their lives free of government supervision, only to have that expectation ripped away when SORA was enacted and retroactively applied to their past conviction. If we accept, as we must, that SORA is a non-punitive regulatory scheme as applied to the latter group, we see no meaningful distinction sufficient to support the opposite conclusion with regard to Hickerson and his proposed class. The burdens on the two classes of individuals are no different, and the calculus under the five *Mendoza-Martinez* factors discussed above is unchanged.

---

'criminal' . . . would severely undermine the Government's ability to engage in effective regulation." (citation omitted)).

*c. Hickerson has not substantiated his assertion of a broad class.*

The third, more technical, defect with Hickerson's claim is that he does not substantiate the existence of a "broad class." He asserts that there are "countless" others and "many affected people" in his same circumstances, though acknowledges that it "is unknown to Mr. Hickerson's defense team just how many self-described 'former' sex offenders there are" in his same position. Hickerson speculates that "it is a fair bet that there are thousands of potential people" who completed their sentences and any probationary term before SORA's enactment yet may be required to register as the result of a subsequent non-registration offense. Maybe that is a fair bet, but to whatever extent *Arthur* signaled a willingness to entertain an ex post facto challenge to SORA post-*In re W.M.*, it indicated that a litigant cannot establish a broad class through the "mere assertion[s] of counsel." 253 A.3d at 144-45.

Hickerson has not been able to identify *any* others who have found themselves in his situation despite SORA being enacted more than twenty years ago. That would not be a serious defect if SORA were a recent law with a limited track record—perhaps reason alone could supplant data if that were so—but SORA is decades old. As best we can tell, the only litigant that we have seen in this court who appears to have been in Hickerson's situation is K.M.—from *In re W.M.*, discussed extensively

above—but two individuals do not constitute a broad class. And if K.M. is in fact in the same class as Hickerson, that only strengthens the likelihood that *In re W.M.* addressed this exact scenario and forecloses Hickerson's present claim. See *supra* Part II.B.2.a. Because *Arthur* was decided after this appeal was argued, if this were the only deficiency with Hickerson's argument we might be inclined to remand to give Hickerson an opportunity to substantiate the class of others like him that he asserts exists. We do not remand, however, because Hickerson's ex post facto claim cannot be reconciled with *In re W.M.* and *Smith* in any event, *supra* Part II.B.2.a-b, and so we reject it outright, independent of this minor shortcoming.[15]

---

[15] Hickerson makes two other constitutional claims that require little discussion. First, Hickerson argues that it is a violation of due process to force him to register as a sex offender absent any individualized assessment of his risk to the public. That argument is foreclosed by *In re W.M.*, 851 A.2d at 447 (SORA registrants "have no right to a hearing on their current dangerousness as a matter of procedural due process"). Second, Hickerson argues that sex offender registration constitutes cruel and unusual punishment as applied to him. Because we determine that registration is not a punishment at all, that disposes of Hickerson's Eighth Amendment claim that it is a cruel and unusual punishment. *See Garner v. U.S. Dep't of Lab.*, 221 F.3d 822, 827-28 (5th Cir. 2000) (where a restriction "does not impose punishment," it "necessarily" follows "that it does not violate the eighth amendment's proscription against cruel and unusual punishment"); cf. *supra* note 7 (differentiating what constitutes a "penalty" under the Sixth Amendment).

## III.

We affirm the Superior Court's order.

*So ordered.*

EASTERLY, *Associate Judge*, concurring: I join in the majority opinion's analysis of Mr. Hickerson's FYCA set-aside claim and in its conclusion that Mr. Hickerson's various constitutional claims cannot succeed. But because I see no articulation of a group-based as applied ex post facto challenge to the District's SORA in Mr. Hickerson's briefing, I would decide his ex post facto claim differently.

Mr. Hickerson makes an indeterminate ex post facto claim in his briefs to this court. There are indications that he is seeking to raise a facial challenge to the SORA statute: in his initial brief he cites to Justice Stevens's dissent in *Smith v. Doe*, 538 U.S. 1009 (2003) (upholding the constitutionality of the federal SORA), asserts that "SORA's requirements resemble traditional shaming punishments," and in his reply asserts that "an en banc court could decide . . . that *In re W.M.*[, 851 A.2d 431 (D.C. 2004), in which this court held that our SORA statute is not facially unconstitutional under the ex post facto clause,] should *not* be followed." There are other, more

explicit indications, however, that Mr. Hickerson seeks to challenge SORA as applied only to himself. He states that "SORA's registration and compliance requirements as applied to Mr. Hickerson definitely constituted punishment" and discusses the personal unfairness of requiring him to register under SORA. As the majority notes, *ante* at 18-19, our precedents bar both of these types of challenges. *See In re W.M.*, 851 A.2d at 440 (holding that the District's SORA is not facially unconstitutional under the ex post facto clauses); *Arthur v. United States*, 253 A.3d 134, 145 (D.C. 2021) (rejecting any ex post facto challenge to SORA as applied to a single individual). Because this is the extent of Mr. Hickerson's ex post facto argument, I would conclude that his argument fails under *In re W.M.* and *Arthur* and end the analysis there.

The majority opinion discerns a group-based ex post facto claim on behalf of those who "had completed the entirety of [their] sentence[s] and parole prior to the enactment" of SORA, *ante* at 21, and then concludes this claim is foreclosed. *See ante* at 21-28. It relies on statements in Mr. Hickerson's brief referring to other District residents who might share his circumstances, quoted *ante* at 20 n.11 and 27, but these statements come from Mr. Hickerson's introductory description of D.C.'s SORA statute and its general reach—not from his ex post facto claim or even his discussion of his constitutional claims more broadly. Given this, I would not use

this case to announce that such a group-based, as-applied ex post facto challenge to D.C.'s SORA statute is foreclosed—a holding the government has not requested, having responded only to the ex post facto claim as Mr. Hickerson briefed it.

Moreover, I have reservations about aspects of the majority opinion's legal analysis in rejecting this group-based, as-applied ex post facto claim. First, I question the majority opinion's reliance on *Smith v. Doe*, 538 U.S. 1009 (2003), and *In re W.M.* to reach its conclusion. The majority opinion acknowledges that both *Smith* and *In re W.M.* "attached no significance to" the potentially heightened burden placed on people who were no longer under any form of judicial supervision when SORA was enacted, but who were subsequently compelled to register thereunder. *Ante* at 21-22. Nevertheless the majority opinion states that these decisions "compel[]" us to conclude this group could not successfully bring an ex post facto challenge. *Ante* at 23. I disagree. It is well established that this court is only bound by prior cases where "the judicial mind has been applied to and passed upon the precise question" raised. *In re Q.B.*, 116 A.3d 450, 455 (D.C. 2015) (quoting *United States v. Debruhl*, 38 A.3d 293, 298 (D.C. 2012)). "Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." *Id.* (brackets omitted) (collecting cases); *cf. id.* ("That we have affirmed a conviction under a

particular statute in the past does not foreclose subsequent parties from bringing legal challenges that could have been, but were not, raised in an earlier case."). Any "likely" commonalities between some of the *Smith* and *W.M.* litigants and Mr. Hickerson notwithstanding, *see ante* at 22, these cases should not be treated as precedents foreclosing all as-applied challenges from registrants sharing those qualities.

Second, I question whether we should use this case to cast doubt on this court's determination in *Arthur* (a decision that the parties did not discuss in their briefs because it had not yet issued) that a substantiated group-based, as-applied ex post facto challenge to SORA might be viable. The majority opinion states the court in *Arthur* only "entertained th[is] possibility" "based on a government concession." *Ante* at 19-20. I disagree. The court in *Arthur* explained that the government, relying on *Seling* and *W.M.*, had argued that "appellant's as-applied challenge is foreclosed." 253 A.3d at 141. The court then explained that it read *Seling* differently. Specifically, it stated that other courts had "incorrectly" interpreted *Seling* to hold that "ex post facto challenges [to SORA] cannot be brought on an as-applied basis" and instead set forth its understanding of *Seling*'s limited holding:

> A more precise description of the holding of *Seling* is that the Supreme Court "rejected the argument that a statute can be declared punitive *'as applied' to a particular person* when the highest State court has

already definitively construed the statute as civil." ... That is precisely the situation presented here; that is, this court, the highest court of the District of Columbia, has already definitively construed SORA as civil. Accordingly, we may not re-evaluate SORA's civil nature *by reference to the effect that it has on appellant as "a single individual." Seling*, 531 U.S. at 262, 121 S. Ct. 727.

*Id. at* 141-42 (emphasis added).[16] "[W]ith this background," the court in *Arthur* "proceed[ed] to consider appellant's" facial and as-applied ex post facto arguments. *Id.* The concession that the majority opinion highlights, which the government only "seemed" to make about the possibility that "an as-applied ex post facto challenge might lie if the punitive effects are alleged to burden a broad class of sex-offenders," was referenced paragraphs later in the careful analysis of those arguments, *id.* at 144, and hardly framed the discussion in *Arthur*; rather, the court rejected this general concession as an adequate support for the appellant's cognizable group-based as-applied ex post facto challenge. *Id.* at 144-45 (concluding that "appellant has not put before us the 'clearest proof' of punitive effects that would be required to afford him relief on his ex post facto claim" (quoting *Seling*, 531 U.S. at 261)).

---

[16] The majority quotes from this passage, *ante* at 20 n.11, but omits the language making it clear that that the court concluded that *Seling* only barred as-applied-to-an-individual ex post facto claims.

For these reasons, I depart from the majority opinion's ex post facto analysis but concur in the judgment.